Archie W. SONENSTAHL, et
al., Appellants,

John D. Hartsfield, et al., Plaintiffs,

v.

L.E.L.S., INC., and L.E.L.S. Local 19,

Respondents,

Hennepin County, Respondent,

Kenneth Miller, et al., Defendants.

No. C8–84–2149.

Court of Appeals of Minnesota.

July 23, 1985.

David A. Singer, Minneapolis, for Sonenstahl and Hartsfield.

Phillip I. Finkelstein, Bloomington, Greg M. Corwin, St. Louis Park, for L.E.L.S. Inc.

Robert T. Rudy, Minneapolis, for Hennepin County.

Hubert H. Humphrey, III, Atty. Gen., Brad P. Engdahl, Asst. Atty. Gen., St. Paul, amicus curiae for Bureau of Mediation Services.

Heard, considered and decided by FOLEY, P.J., and WOZNIAK and CRIPPEN, JJ.

## OPINION

FOLEY, Judge.

The appellants, who are detectives in the Hennepin County Sheriff's Department, appeal from a judgment and an order denying their motion for a new trial. The trial court determined that the respondent union (L.E.L.S.) did not breach its duty to fairly represent the detectives when it negotiated the 1982 and 1983 collective bargaining agreements between the Sheriff's Department and the County. The court also held that the detectives did not have the right to a jury trial and that they could not properly subpoena the mediator from the Bureau of Mediation Services who had assisted with the negotiation process. We affirm.

## FACTS

The appellants are detectives in the Hennepin County Sheriff's Department. The respondent union L.E.L.S. and its local have represented the sheriff's department in the negotiation of labor contracts with the county since 1978.

In the spring of 1981 the union became aware that the county might be willing to reopen the 1981 wage rate for all sheriff's department personnel in order to negotiate a cost-of-living increase which had been given to other county personnel for 1981. The county also expressed a willingness to offer the detectives in the sheriff's department an additional 2½% pay increase to bring them up to the increased salary which had been approved for non-union County Investigators. This similar wage level between the departments is referred to as "parity." The chief negotiator for the union, Roland Miles, determined that since the negotiations for the 1982 contract would begin in the summer of 1981, the cost-of-living and parity issues should be deferred until then.

Negotiations for the 1982 contract then began in the summer of 1981. The parity issue was submitted to the county, along with a package of other issues. The county initially accepted the detectives' parity request, but reserved the other issues for negotiation. However, sometime in mid-fall of 1981, Roland Miles indicated that the parity issue could possibly be used as a trade-off for other benefits.

A meeting of the general union membership was held in December 1981. Approximately 20 to 50 members were present. A 10% overall increase in salary was being requested and, in addition to the detectives' parity request, a group of junior deputies in the sheriff's department was also requesting a further salary increase.

At the December meeting, the members voiced their strong feelings that the detectives should not receive the parity increase. They expressed hostility towards the detectives, and the mood was tense. A motion was offered and passed that the detectives' parity should be traded for other benefits, if possible, although nothing specific was indicated.

In January 1981 the detectives formally requested withdrawal from union representation. They also refused to vote for the 10% across-the-board increase submitted to the general members, which included the request for the junior deputies but which did not include the detectives' parity request. The 10% proposal was not ratified by the general members.

In March 1982 another general meeting was held, at which Roland Miles presented an overall across-the-board package of a 9% increase, plus concessions for the junior deputies. That contract was ratified by the general members.

Although the negotiating committee had apparently been aware that the county would accept the parity increase, and that the union could not obtain additional benefits for other members by giving up the detectives' parity, the committee nonetheless had voted to exclude the parity issue from the final package submitted to the general members. The reason given for this decision was that inclusion of the parity proposal would jeopardize the entire package, due to the general members' demonstrated negative attitude towards the detectives at the December meeting. The county had indicated that the parity issue should not be included if it would cause ratification problems.

After the 1982 contract was ratified, the detectives went to the union and requested release from union representation. The union indicated that it was not interested in releasing the detectives, but would request the local to pursue the parity issue in the negotiations for the 1983 contract.

In 1983, no equity (i.e. parity) adjustments were allowed by the county, due to the state and county's financial situation. However, because the investigators would only be receiving a 5 to 6% increase in salary, Roland Miles asked for an across-the-board increase of 9% for the sheriff's department, which would have brought the detectives' salary above parity. He did not ask for a greater amount for the detectives than the others fearing that the others would get less. The matter went to arbitration, since the county would not agree to the 9% increase. The parity argument was submitted to the arbitrator, but he eventually ordered only a 6% across-the-board increase.

## ISSUES

1. Do the detectives have a right to a jury trial?

2. Does the record support the trial court's conclusion that the union did not breach its duty of fair representation?

3. Did the trial court properly quash a subpoena which would have required the mediator to appear and testify regarding the union negotiator's attitude and behavior?

## ANALYSIS

### I.

#### Right to a jury trial.

The detectives' complaint alleged that the union breached its duty to fairly represent them in the negotiation process, and that as a result they suffered monetary damages. The detectives also requested injunctive relief to prohibit the union from discriminating against them in the future, and sought a court order requiring the union to request decertification from the Bureau of Mediation Services as the detectives' representative. The detectives' request for a jury trial was denied by the trial court.

The Public Employment Labor Relations Act (P.E.L.R.A.), which governed the negotiations and mediation in the present action, does not specifically provide for a right to trial by jury in a case involving an alleged breach of a union's duty of fair representation.

The Minnesota Constitution provides:

> The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy.

Minn. Const. Art. I, § 4.

The respondent union argues that because the duty of fair representation did not exist as a cause of action at the time the Minnesota Constitution was drafted, it cannot be considered a "case at law," entitling the detectives to a jury trial. In this instance, however, the detectives are specifically claiming an entitlement to damages for an alleged injury by another. Our court recently stated:

If a plaintiff's claim is for the recovery of money, the Minnesota Constitution assures a right to a jury trial.

*Olson v. Aretz,* 346 N.W.2d 178, 181 (Minn. Ct.App.1984) (*pet. for rev. denied* October 30, 1984).

Because the detectives' prayer for relief specifically sets forth a claim for damages, it might appear that under *Olson* the detectives would have a right to a jury trial on their claim for damages. The respondent union argues, however, that because the detectives' complaint is "primarily equitable," a jury trial is not required, even on the damages claim.

As noted above, the detectives' complaint also requested that the union be prohibited in the future from discriminating against them. The detectives requested further that the court issue an order which would require the Bureau of Mediation Services to review a request for the union's decertification as the detectives' representative. The issue is whether these requests for future injunctive relief are independent of the detectives' prayer for past damages, or whether they make the entire lawsuit "primarily equitable".

In *Koeper v. Town of Louisville,* 109 Minn. 519, 124 N.W. 218 (1910), the plaintiff had requested that the defendant be restrained from maintaining a flow of water over the plaintiff's land and also requested monetary damages sustained by the flow of water in the past. The *Koeper* court explained:

There is a clear distinction between cases * * * where two causes of action, one legal and the other equitable, are united in the same action, and those where the cause of action is an equitable one, in which equitable relief is sought, and also legal relief as an incident to the equitable cause of action; for example, a claim for damages growing out of the facts upon which the equitable relief depends. The rule in cases of this kind is that in an action not of a strictly legal nature, where the plaintiff seeks both equitable and legal relief, neither party is

entitled to a jury trial as a matter of right.

*Id.* at 521–22, 124 N.W. at 218. The *Koeper* court found the plaintiff's action primarily equitable and affirmed the trial court's denial of a jury trial.

*Indianhead Truck Line, Inc., v. Hvidsten Transport, Inc.,* 268 Minn. 176, 194, 128 N.W.2d 334, 347 (1964), quoted the *Koeper* decision with approval and denied a jury trial where a plaintiff brought a suit for specific performance of an agreement and also sought money damages for the failure to perform under that agreement.

In the present case the damages sought by the detectives are also intertwined with the request for injunctive relief, since the behavior which caused the alleged damages (i.e. the alleged failure to fairly represent the detectives) is also that which the detectives are seeking to avoid in the future. Thus, under the above case law, a jury trial is not required by the Minnesota Constitution.

■ The appellant detectives base their claim to a jury trial upon federal law, which tends to favor the right to a jury trial. Although federal decisions may be persuasive where the Minnesota courts have not addressed a subject, in the present instance the Minnesota decisions are dispositive. Even if there is a right to a jury trial under the Seventh Amendment for claims involving fair representation brought in the federal courts, state courts are not required to follow these federal decisions, since the Seventh Amendment is not binding on the states. *Pearson v. Yewdall,* 95 U.S. 294, 5 Otto 289, 24 L.Ed. 436 (1877); *Genzel v. Halvorson,* 248 Min. 527, 531, 80 N.W.2d 854, 858 (1957).

■ We are mindful of our recent decision of *Paoletti v. Northwestern Bell Telephone Co.,* 370 N.W.2d 672 (Minn.Ct.App. 1985), where we applied federal law to a situation involving an alleged breach of the duty of fair representation. However, *Paoletti* was governed by § 301 of the Federal Labor Management Relations Act; whereas the present action was brought

under P.E.L.R.A.—a Minnesota act. *Paoletti*, therefore, is not determinative, and we find that in the present situation state law did not entitle appellants to a jury trial.

## II.

### Duty of fair representation.

*Ford Motor Co., v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) was an early case involving a union's duty of fair representation. In *Huffman* the United States Supreme Court stated that a union must be allowed a "wide range of reasonableness * * * in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Id.* at 338, 73 S.Ct. at 686.

In *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Court cited a different standard, relying in part upon *Huffman*, but stating:

> A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.

*Id.* at 190, 87 S.Ct. at 916.

*Motorcoach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), quoted *Vaca* with approval, but indicated that conduct which is "arbitrary, discriminatory or in bad faith" must be substantially evidenced by "fraud, deceitful action or dishonest conduct" on the part of the union. *Id.* at 299, 91 S.Ct. at 1924.

The standard which Minnesota has adopted is found in *Davis v. Boise Cascade Corp.*, 288 N.W.2d 680 (Minn.1979), which adopts the *Lockridge* test of "substantial evidence of fraud, deceitful action or dishonest conduct". *Id.* at 683. *Boise Cascade* was recently cited with approval, although on different grounds, by our Supreme Court in *Eisen v. State, Dept. of Public Welfare*, 352 N.W.2d 731, 735 (Minn.1984).

The trial court in its original order quoted the *Boise Cascade* standard, but in a later memorandum stated that it had not applied that test. The court indicated, rather, that the union had "acted fairly and in good faith in all respects," and "had not acted arbitrarily or capriciously."

 Although the trial court did not apply the *Boise Cascade* standard in reviewing the union's conduct, this error was harmless, since a *lower* standard was applied by the court. Clearly, since the court found that the union had acted "fairly and in good faith," *a fortiori*, it did not find the "fraud, deceitful conduct or dishonest conduct" required by *Boise Cascade* for a breach of the union's duty of fair representation. The court's conclusion is supported by the record. The appellant detectives cite substantial testimony that the negotiators acted in bad faith; however, much of that evidence was hearsay which, although allowed by the court, appears to have been rejected. On the other hand, there is evidence in the record indicating that Roland Miles and the other negotiators had valid reasons for refusing to submit the parity issue to the general members after the December general meeting. It is undisputed at that meeting the members expressed hostile and strong feelings that the detectives should not receive the additional parity increase. The negotiators testified that they believed the continued inclusion of the parity issue in subsequent contract packages would jeopardize those entire packages submitted to the general members. As stated in *Huffman*:

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

*Huffman,* 345 U.S. at 338, 73 S.Ct. at 686.[1] The detectives' argument that our decision should be based upon the union's result, rather than upon its conduct is inconsistent with the above analysis.

The trial court had the opportunity to observe the witnesses and to gauge their credibility. Since there is evidence to support its determination that the negotiators acted in good faith, rather than in a fraudulent or deceitful manner, the court's findings should not be disturbed on appeal. *Berry v. Goetz,* 348 N.W.2d 376 (Minn.Ct. App.1984); Minn.R.Civ.P. 52.01.

### III.

### Subpoena of mediator.

The final issue raised by the appellant detectives is whether the trial court erred when it quashed the subpoena of the mediator who had participated in the negotiations between the union and the county. The detectives contend the mediator would have testified that Roland Miles "flagrantly misrepresented" the detectives' interests and "continuously rejected" offers from the county regarding the parity issue. The detectives also allege, and testimony indicates, that the mediator himself expressed a willingness to testify to this alleged breach of the union's duty in court.

The detectives correctly note that a provision of P.E.L.R.A. states that all mediation sessions between public employers and employees or their representatives are public meetings unless otherwise provided by the Director of Mediation Services. Minn. Stat. § 179A.14, subd. 3 (1984). In the present situation there is no indication that the negotiation proceedings were intended to be private. The trial court, however, found that "the proffered reasons for [the mediator's] testimony are insufficient to overcome the compelling need for a media-

tor to maintain the confidences of the parties and the appearance of impartiality". Thus, the court clearly believed that the policy of promoting successful mediation of public employment disputes outweighed the need for disclosing what the mediator believed was happening in this instance. As the respondent union and amicus Bureau of Mediation Services note, P.E.L.R.A. itself provides that successful mediation furthers the public interest:

> [Unresolved] disputes between the public employer and its employee are injurious to the public as well as to the parties. Adequate means must be established for minimizing them and providing for their resolution * * *.

Minn.Stat. § 179A.01 (1984). This language supports the trial court's decision to disallow the mediator's testimony, based upon policy reasons.

■ The legislature has recently recognized the need to maintain confidential certain communications made during the mediation process. In 1984 by amendment to the statute regarding privileges the legislature stated:

> A person cannot be examined as to any communication or document, including worknotes, made or used in the course of or because of mediation pursuant to an agreement to mediate. This does not apply to the parties in the dispute in an application to a court by a party to have a mediated settlement agreement set aside or reformed. A communication or document otherwise not privileged does not become privileged because of this paragraph. This paragraph is not intended to limit the privilege accorded to communication during mediation by the common law.

Minn.Stat. § 595.02, subd. 1(k) (1984). In view of this statutory mandate,[2] we believe

---

1. Although the respondent union attempts to distinguish the various standards based upon whether a union was negotiating or interpreting a contract, the cases themselves make no such distinction, but cite one another interchangeably. Thus, *Vaca*—a contract interpretation case—cites *Huffman,* which is a negotiation case.

2. The cited statute became effective August 1, 1984. Although this matter was tried prior to the effective date of the statute, the policy and reasoning behind the statute are applicable in this instance.

the reasoning of the trial court was correct, and its decision to quash the subpoena is therefore affirmed.

## DECISION

The trial court correctly determined that the appellants were not entitled to a jury trial, a mediator should not have been required to testify, and the union did not breach its duty to fairly represent the appellant-members.

Affirmed.