205 F.3d 1107 (9th Cir. 1999)
 COMMODITY FUTURES TRADING COMMISSION; THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, PLAINTIFFS,
AND
NEIL ADVANI, AKA, ANIL ADVANI, INTERVENOR-APPELLANT,
v.
TOPWORTH INTERNATIONAL, LTD, AKA, SEAL A; LIDA INTERNATIONAL FINANCIAL DATA, INC., AKA, SEAL B; WORTH FINANCIAL DATA, INC., AKA, SEAL C, DEFENDANTS-APPELLEES,
v.
RICHARD V. HOEGH, RECEIVER-APPELLEE. COMMODITY FUTURES TRADING COMMISSION; THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, AKA, SEAL 2, PLAINTIFFS,
v.
TOPWORTH INTERNATIONAL, LTD, AKA, SEAL B; WORTH FINANCIAL DATA, INC., AKA, SEAL C; FRED A. WONG, DEFENDANTS-APPELLANTS,
v.
RICHARD B. HOEGH, RECEIVER-APPELLEE,
AND
LIDA INTERNATIONAL FINANCIAL DATA, INC., DEFENDANT.
 Nos. 97-56590, 98-55673
 U.S. Court of Appeals, Ninth Circuit
 Argued and Submitted April 12, 1999
Decided June 28, 1999
As Amended March 23, 2000
 
 Stanley L. Friedman, Beverly Hills, California, for appellants Fred A. Wong, Topworth International Ltd. and World Noon.
 Michael R. Barbee, Hughes, Hubbard & Reed, Los Angeles, California, for receiver-appellee Richard V. Hoegh.
 Victor J. Daniels, Los Angeles, California, for the Intervenor-Appellant Neil Advani, aka Anil Advani.
 Appeals from the United States District Court for the Central District of California A. Andrew Hauk, District Judge, Presiding D.C. No. CV-94-01256-AAH.
 Before: Robert Boochever, Diarmuid F. O'Scannlain and A. Wallace Tashima, Circuit Judges.
 
 BOOCHEVER, Circuit Judge
 
 1
 The Commodities Futures Trading Commission brought suit against Topworth International, Inc., and two related companies for violations of the Commodities Exchange Act. Topworth defaulted, and the district court entered an order permanently enjoining Topworth from continuing operation, and requiring Topworth to disgorge the money obtained in violation of the Act. The district court appointed a permanent receiver, who filed a plan distributing any remaining assets to investors pro rata according to their net investment. Neil Advani, an individual investor, appeals this method of apportionment. After settlement negotiations failed, the permanent receiver brought an application for a restraining order and an order to show cause why funds held in the trust account of Topworth's attorney should not be turned over to the permanent receiver. The district court granted the order, and Topworth, Topworth's attorney, and a shareholder appeal the turnover of funds.
 
 FACTS
 
 2
 On February 28, 1994, the Commodities Futures Trading Commission ("CFTC") and the California Department of Corporations filed a complaint for a restraining order, preliminary injunction, and other relief against three companies: Topworth International, Inc. ("Topworth"), a Hong Kong corporation; Lida International Financial Data, Inc. ("Lida"), a California corporation; and Worth Financial Data, Inc. ("Worth"), a California corporation. The complaint alleged that each company "offered and is offering to the investing public the opportunity to speculate in price changes in various precious metals (gold and silver) and foreign currencies by offering to them contracts for the purchase or sale of precious metals and foreign currencies for future delivery." Such activity violated the Commodities Exchange Act ("CEA"), 7 U.S.C.S 6(a), and the California Commodity Law of 1990, Cal. Corp. Code S 29520. Section 6(a) makes it unlawful to deal in contracts for the purchase or sale of a commodity for future delivery, unless such a transaction is conducted under the rules of a board of trade designated by the Commission as a "contract market" and is properly recorded. Cal. Corp. CodeS 29520 prohibits entering into commodity transactions unless one of the parties is registered with the CFTC, among other exceptions. See Cal. Corp. Code SS 29530, 29531, 29532. None of the companies conducted business under the rules of a board of trade and none was registered with the CFTC.
 
 
 3
 Lida and Worth consented to the entry of a preliminary injunction restraining the companies from continuing to violate the CEA. Topworth defaulted. Later, the court entered an order for a permanent injunction and for disgorgement by default against Topworth. The order set the total amount to be paid by Topworth at approximately $6 million.
 
 
 4
 The court appointed a permanent receiver ("the Receiver") to take charge of the companies' assets and protect the funds from further dissipation. The Receiver subpoenaed bank records from the Bank of China, and when the bank did not produce the records, brought a motion to compel. He eventually obtained some bank records, although he never obtained any records from Topworth. Customers did send documentation they had received from Topworth, but this information was not reflected in any of the defendants' records.
 
 
 5
 The Receiver found no evidence that Topworth actually executed its customers' orders on a commodity exchange, although the company sent statements to its customers purporting to document such purchases and sales. The state of the records was consistent with a type of " `bucketed trades' in which Topworth would take into its own account the opposite side of a given trade without executing the order on an exchange." See Purdy v. Commodity Futures Trading Comm'n, 968 F.2d 510, 520 (5th Cir. 1992) ("bucketing" in futures trading is the "method of doing business wherein orders of customers for the purchase or sale of commodities for future delivery, instead of being executed by bonafide purchases and sales with other traders, are simply matched and offset in the soliciting firm's own office and the firm itself takes the opposite side of customers' orders" (quotations omitted)). The Receiver also concluded that Worth and Lida commingled investors' funds with general operating funds, and then transferred the money to Topworth's Hong Kong bank accounts, where it was promptly withdrawn. The funds turned over by Lida's and Worth's banks thus contained no equity balances of the companies' customers. Individual accounts were untraceable.
 
 THE DISTRIBUTION PLAN
 
 6
 On July 25, 1997, the Receiver filed a "Petition for Approval of Proposed Claims Review and Allowance Process and Plan of Distribution of Receivership Assets" of Lida, Worth, and Topworth. Because each entity appeared to be the alter ego of the other, the plan treated the three companies as one fund for the purposes of paying claims. The Receiver proposed three classes of creditors: first, the Receiver and fees associated with the receivership; second, the allowed claims of public investors in the companies; and third, the claims of all other creditors. The plan provided:
 
 
 7
 "The Receiver will base the approved amount of the claims of public investors, Class Two, on the claimant's "Net Investment"--defined as the total amount deposited by the claimant with the Receivership Entities less amounts returned to the claimant by the Receivership Entities and less any illegal trading profits reinvested by or credited to the claimant. This recission[sic]-and-restitution theory of recovery best furthers public policy and the cost-effective administration of the receivership estate. To allow claims based on profits made in the illegal trading operations would tend to legitimize those illegal trading operations contrary to public policy."
 
 
 8
 The receivership would serve on all claimants a schedule of the proposed treatment of each claim and a hearing would follow. Claimants wishing to object to the proposed treatment of their claims had 30 days after service of the schedule to file written objections.
 
 
 9
 The district court signed an order granting the petition for approval.
 
 SETTLEMENT NEGOTIATIONS
 
 10
 While formulating the distribution plan, the Receiver had attempted to take custody and possession of all Topworth's assets, pursuant to the disgorgement ordered by the preliminary injunction, and had engaged in settlement Discussions with Fred Wong, the attorney of record for Topworth. Wong also conducted negotiations on behalf of World Noon, Ltd., a Hong Kong corporation and a fifty-percent shareholder of Topworth. The other half of Topworth's shares was owned by another Hong Kong corporation. World Noon's director, Yu Kwai Yee, was one of the two authorized signatories of Topworth's Bank of China account, and Yu's signature appeared on nearly every document authorizing withdrawals from the account. The bank records showed a practice of withdrawing deposits from Topworth's account as soon as the money arrived from the United States.
 
 
 11
 In November 1995, the Receiver traveled to Hong Kong to attempt to settle the receivership claim against Topworth. The parties signed an agreement under which Topworth would pay $1.1 million to the receivership and to Topworth's investors,in exchange for releases. The money never was paid.
 
 
 12
 Toward the end of 1996, settlement Discussions resumed, and Topworth agreed to pay $600,000. Wong informed the Receiver that $300,000 would be payable immediately. On November 12, 1996, World Noon wired $300,000 to Wong's trust account.
 
 THE RESTRAINING ORDER AND TURNOVER
 
 13
 Almost a year later, in late September 1997, the distribution plan was approved and the Receiver brought an ex parte application for a temporary restraining order to freeze the $300,000 in Wong's trust account, as well as an order to show cause why the money should not be turned over to the receivership. The district court granted the restraining order and scheduled a hearing on the order to show cause. Wong filed an opposing declaration stating that the funds in his trust account belonged to Topworth's shareholders, not Topworth.
 
 
 14
 At the hearing, Wong insisted that the $300,000 was not Topworth's, but property of Topworth's shareholders. The court ordered him to deposit the $300,000 into the court's registry and scheduled a later hearing to determine the final destination of the $300,000.
 
 
 15
 At the later hearing, Wong again stated that "the money at issue does not belong to Topworth" but to its shareholders, and that the money should therefore not be turned over to the Receiver but returned to Topworth's shareholders. He presented a declaration from World Noon's director, Yu, stating that the shareholders of Topworth had agreed to raise the settlement money, and that World Noon had wired Wong the $300,000 for the initial payment. Yu asserted "At the time said $300,000.00 was sent to Mr. Wong, Topworth had already ceased doing business for over two years. None of the funds sent to Mr. Wong came from that of Topworth's funds [sic]."
 
 
 16
 In an order entered February 23, 1998, the court found that Yu's declaration was improper in form and was therefore inadequate to establish World Noon's claim to the funds; that World Noon and Yu controlled Topworth; that Topworth was grossly undercapitalized; that to observe the corporate form would "sanction a fraud and promote inJustice; " and that World Noon had "acted inequitably." As Conclusions of law the court held that the deposited $300,000 was Topworth's property; that the Receiver had the superior claim; and that Topworth's corporate form should be disregarded. The court ordered the money paid to the Receiver from the court's registry.
 
 DISCUSSION
 
 17
 There are two appeals before us. Topworth, Wong, and World Noon appeal the district court's turnover order and its determination that the $300,000 belongs to Topworth. Neil Advani, an individual investor in Lida, appeals from the court's order approving the distribution plan, disputing the CFTC's jurisdiction and the merits of the plan.
 
 I. TOPWORTH'S APPEAL OF THE TURNOVER ORDER
 A. Appellate Jurisdiction
 
 18
 28 U.S.C. S 1291 provides: "The courts of appeals... shall have jurisdiction of appeals from all final decisions of the district courts of the United States...." The CFTC argues that the turnover order is not appealable as a final order under S 1291.
 
 
 19
 In general, a turnover order is not appealable as a final order under 28 U.S.C. S 1291 when such an order does not "finally resolve the parties' rights to [the entity in receivership's] assets." Federal Trade Comm'n v. Overseas Unlimited Agency, Inc., 873 F.2d 1233, 1234-35 (9th Cir. 1989).
 
 
 20
 In State St. Bank & Trust Co. v. Brockrim, Inc., 87 F.3d 1487 (1st Cir. 1996), the court of appeals refused to review an order approving the sale of the defendant's assets as a final order, because before the sale became binding the district court had to "hold a hearing and resolve potentially difficult and disputed issues, including tax matters, receivership costs, and the actual amount that will be realized upon the... sale." Id. at 1490.
 
 
 21
 The appellants in this case argue that jurisdiction under S 1291 is appropriate because the district court's order did "finally resolve the parties' rights to [the ] assets" when the court held that the $300,000 belonged to Topworth, not to World Noon, Topworth's shareholder. We agree. "To be final, a judgment must dispose of all the rights and liabilities of at least one party as to at least one claim." State St. Bank, 87 F.3d at 1489. Because this order was final as to the rights of appellants Topworth, World Noon, and Wong in the $300,000, we have jurisdiction over this appeal.
 
 B. Ownership of Funds
 
 22
 The appellants assert that the turned-over funds belonged not to Topworth, but to World Noon, its 50% shareholder. This is a challenge to the district court's factual findings, which are reviewed for clear error, but with particularly close scrutiny because the court adopted the Receiver's proposed findings of fact. Phoenix Eng'g & Supply Inc. v. Universal Elec. Co., 104 F.3d 1137, 1140 (9th Cir. 1997).
 
 1. Yu Declaration
 
 23
 The appellants assert that the district court should have taken into account the declaration of Yu, World Noon's director, to the effect that the $300,000 wired to Wong's trust account came from World Noon, not Topworth. In the district court the Receiver argued that the declaration was inadequate because it did not satisfy 28 U.S.C. S 1746(1), which states that an unsworn declaration executed outside of the United States must contain, "in substantially the following form.... `I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature).' " The Yu declaration states "I declare the foregoing to be true and correct under penalty of perjury under the laws of Hong Kong or any applicable jurisdiction," and is dated, signed and notarized. The Receiver argued that the declaration is invalid because instead of "under the laws of the United States" it states "under the laws of Hong Kong or any applicable jurisdiction." The district court adopted the proposed finding that "[s]uch declaration is improper in form and is therefore inadequate to establish a basis for World Noon's claim."
 
 
 24
 The district court was mistaken. First, the declaration was declared before a notary public, so S 1746 may not even apply. Second, S 1746 requires only that the declaration "substantially" comply with the statute's suggested language, and the phrase "under the laws of... any applicable jurisdiction" is substantially compliant with the statute's phrase "under the laws of the United States." See Schroeder v. McDonald, 55 F.3d 454, 460 n. 10 (9th Cir. 1995) (verification conformed with statute although language "did not follow S 1746's form with precision"); Trammell Real Estate Corp. v. Trammell, 748 F.2d 1516, 1518 (11th Cir. 1984) (declaration language "substantially similar" to language of S 1746 meets statute's requirements).
 
 
 25
 We therefore consider the declaration as part of the district court record.
 
 2. Alter ego determination
 
 26
 The district court's decision to ignore the corporate form of Topworth and conclude that funds allegedly held by its shareholders were actually Topworth's is an application of the alter ego doctrine reviewed for clear error. McClaran v. Plastic Indus., Inc., 97 F.3d 347, 358 (9th Cir. 1996).
 
 
 27
 The record contained evidence that Topworth was undercapitalized, with a capitalization of $2, two shares for $1 each. In light of the millions of dollars flowing to Topworth, this extreme undercapitalization supports an alter ego determination. " `If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.' " Automotriz del Golfo de California S. A. v. Resnick, 306 P.2d 1, 4 (Cal. 1957) (quoting Ballantine on Corporations 303 (rev. ed. 1946)). The court was also entitled to consider "all relevant facts concern ing the manner in which the business was operated. " Id. Although the Receiver was unable to obtain complete records, what he did obtain showed large check transfers out of Topworth's account to World Noon and to Yu, numerous cash withdrawals signed by Yu, and many immediate withdrawals of money received in Topworth's bank accounts. The evidence supports both a finding of alter ego liability and the inference that Topworth's funds were immediately transferred out of its accounts, including substantial amounts to Yu.
 
 
 28
 The Yu declaration contains no information that would change the alter ego determination. Yu's statement that "At the time said $300,000 was sent to Mr. Wong, Topworth had already ceased doing business for over two years. None of the funds sent to Mr. Wong came from that of Topworth's funds" is not inconsistent with the factual finding that Topworth was the alter ego of its shareholders.
 
 
 29
 We conclude that the district court did not clearly err in finding that the alter ego doctrine applied and that the funds wired by Yu could be treated as funds from Topworth. The district court's failure to consider the Yu declaration was harmless error.
 
 C. District Court Procedure
 
 30
 Topworth challenges the entire "summary" procedure used by the district court as improper and in violation of due process. But "[f]or the claims of nonparties to property claimed by receivers, summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard." Securities and Exch. Comm'n v. American Capital Invs., Inc., 98 F.3d 1133, 1146 (9th Cir. 1996), abrogated on other grounds, Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1012 (1998). There was ample opportunity for the appellants in this case to file papers, and two hearings were held in the district court.
 
 
 31
 II. ADVANI'S APPEAL FROM THE DISTRIBUTION ORDER
 
 A. Standing
 
 32
 In general, "one who is not a party before the district court may not appeal a judgment." Citibank Int'l v. CollierTraino, Inc., 809 F.2d 1438, 1440 (9th Cir. 1987). "[A] nonparty to the litigation on the merits will have standing to appeal the decision only in exceptional circumstances when: (1) the party participated in the proceedings below; and (2) the equities favor hearing the appeal." Id. at 1441.
 
 
 33
 Advani invested in Lida in 1993 and 1994. He wrote to the Receiver in June 1996 setting out his investment amounts, and filed a timely proof of his claim in writing on January 14, 1997 in response to the Receiver's invitation. He provided copies of credit card and bank statements and canceled checks to document his investments. He also sent copies of "Client Statements" from Topworth purportedly documenting his balance and trading activity.
 
 
 34
 When the Receiver filed the petition for approval of his proposed distribution plan in July 1997, Advani filed a formal objection arguing that the "net investment" formula for reimbursement was unfair. He appeared pro se at the hearing on the plan on September 22, 1997. The district court considered his objection and dismissed it.
 
 
 35
 In this case, Advani participated in the proceedings below to the full extent possible to an individual investor, writing to the Receiver and the district court, filing a timely formal objection to the plan, and appearing pro se at the hearing. Because of his financial investment in Lida/Topworth, he had a legitimate interest in the method of distribution of the companies'remaining assets. See Securities and Exch. Comm'n v. Wencke, 783 F.2d 829, 834 (9th Cir. 1986) (nonparty creditors may appeal an order regarding an SEC initiated receivership where "they did not formally seek to intervene in the trial court, but nevertheless participated in the district court's proceedings and had a legitimate interest in the outcome of the appeal" (quotations omitted)). Advani participated for several years, rather than coming in at the end of the proceedings. See Collier-Traino, 809 F.2d at 1440-41 (no standing where nonparty did not participate until a postjudgment motion to vacate). Advani has standing to appeal.[1]
 
 B. CFTC's Jurisdiction
 
 36
 Advani claims that the CEA does not give the CFTC jurisdiction over Lida, Worth, and Topworth, because the statute does not authorize the CFTC to regulate transactions in foreign currency, and Advani's transactions were currency transactions only. The complaint states that the three companies dealt in foreign currency and in precious metals contracts, and the district court made a factual finding that Topworth sold contracts for the sale of precious metals and foreign currencies.
 
 
 37
 The CEA gives the CFTC the authority "to regulate the volatile and esoteric market in futures contracts in fungible commodities." Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 468-69 (1997) (quotations omitted)."The Act requires that these `futures contracts' be offered and sold on commission-designated boards of trade, or they are deemed illegal `off-exchange' contracts." Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc., 67 F.3d 766, 772 (9th Cir. 1995). When Congress expanded the statute's coverage in 1974 to include futures contracts in nonagricultural commodities, it also enacted an exception, the so-called "Treasury Amendment" to the CEA, 7 U.S.C. S 2(ii):
 
 
 38
 "Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency... unless such transactions involve the sale thereof for future delivery conducted on a board of trade.
 
 
 39
 (Emphasis added.) Dunn established conclusively that the amendment "was intended to take all transactions relating to foreign currency not conducted on a board of trade outside of the CEA's ambit." Id. at 475. See Commodity Futures Trading Comm'n v. Frankwell Bullion Ltd., 99 F.3d 299, 301 (9th Cir. 1996) ("regardless of whether foreign currency transactions are futures or spot trades, they are exempted from CFTC jurisdiction because they are not transactions involving sales on a board of trade" (footnote omitted)). Congress recognized that "sophisticated off-exchange foreign currency trading... had previously developed entirely free from supervision under the commodities laws," Dunn, 519 U.S. at 473, and that "this market is more properly supervised by the bank regulatory agencies." Id. at 474 (quotations omitted).
 
 
 40
 The CFTC does, however, have the authority under the CEA to regulate precious metals contracts. See Commodity Futures Trading Comm'n v. P.I.E., Inc., 853 F.2d 721 (9th Cir. 1988); Noble Metals, 67 F.3d at 772. Some of the trades in issue in this case are thus within the CFTC's jurisdiction and the CEA's ambit. Advani argues that his trades, because they are exempt transactions in foreign currency, are outside that ambit and thereforenot subject to the Receiver's distribution plan.
 
 
 41
 Cases involving CFTC regulation under the CEA have acknowledged that mixed trading does occur. See Frankwell Bullion, 99 F.3d at 301 & n.1 (company engaged in commodities trades in foreign currency and precious metals markets, but on appeal does not raise claim regarding precious metals); Noble Metals, 67 F.3d at 772 (some of the disputed trades did contemplate actual delivery and fall outside the statute). None of those cases addresses how the CFTC would exercise its authority when an entity engages in a mixture of trades, some of which are covered by the statute and some of which are not.
 
 
 42
 We need not decide that issue in this case because the factual record is not sufficient to show what percentage of the companies' transactions involved exempt foreign currency futures. Although the Receiver does not dispute that Advani's investments were all in foreign currency futures, the company records the Receiver was able to gather did not show any segregation of accounts, any detailed recordkeeping, or even any accounts designated as customer accounts. As a result, there was no account in Advani's or any other customer's name, and no way to tell whether a particular customer's trades were in foreign currency or in precious metals.
 
 
 43
 We therefore hold that the CFTC had the authority to regulate the trading by Topworth, Lida, and Worth. In a case such as this, in which no company records of trades are available and there is indeed little evidence that trades even occurred, the CFTC may exercise its authority over mixed trading. Advani's recovery is therefore subject to the distribution plan approved by the district court.[2]
 
 C. The Distribution Plan
 
 44
 This court reviews a district court's decision involving its supervision of an equitable receivership for an abuse of discretion. United States v. Stonehill, 83 F.3d 1156, 1159 (9th Cir. 1996). This court affords "broad deference " to the court's supervisory role, and "we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose" of orderly and efficient administration of the receivership for the benefit of creditors. Securities and Exch. Comm'n v. Hardy, 803 F.2d 1034, 1037-38 (9th Cir. 1986); see Wencke, 783 F.2d at 837 n.9.
 
 
 45
 Advani's first objection to the plan is that he had not received sufficient information (such as an accounting or detailed records) to decide whether to challenge the plan. The information Advani claims he should have received before the plan was approved, however, could only be provided to him after the plan was approved by the district court. The Receiver could not provide Advani with a schedule proposing the treatment of each claim and an accounting of the Receiver's expenses, as promised in subsections (o) and (r) of the proposed plan, until the court approved the plan and authorized the Receiver to prepare the schedule and the accounting.
 
 
 46
 Advani's second and principal objection is to the pro rata "net investment" method of reimbursement. The Receiver's plan would base each investor's recovery on "the total amount deposited by the claimant with the Receivership Entities less amounts returned to such claimant by the Receivership Entities and less any illegal trading profits reinvested by or credited to such claimant." Advani documented his total investment as $22,700. (He calculated losses in the amount of $10,291.) He then claimed $10,782 in interest on his original investment (at a rate of 19%) for a total of $33,482.
 
 
 47
 Because he believes his records meticulously show his ending account balance, Advani claims he should not be pooled with the other investors, but should receive his final balance, plus interest, before the pro rata distribution is made. He points to the plan approved by the district court inCommodities Futures Trading Comm'n v. Richwell Int'l, Ltd., 163 B.R. 161 (N. D. Cal. 1994). In Richwell, the court approved a plan that distributed remaining assets to existing investors "pro rata on the basis of the lesser of (a) current account balance... and (b) their total net deposits into their margin account." Id. at 162 (footnote omitted). Customers who had made profits would be entitled to their entire initial investment, while those who had suffered losses would be limited to what remained in their accounts. The Richwell court approved the receiver's plan because within its broad discre tion it believed that it was the most equitable compromise, as the company had detailed accounting records which made it not difficult to segregate customer accounts. Id. at 163-64.
 
 
 48
 We conclude that it was within the district court's broad discretion to adopt the Receiver's plan as proposed. The circumstances are different from those in Richwell. Here, there are no company customer records for the purpose of segregating accounts, and any investor without detailed records would be left without recourse. The plan in this case also is consistent with regulations under the CEA, which are made applicable by the Bankruptcy Code, which in turn applies to the Receiver under the local rules of the district court.
 
 
 49
 The local rules of the Central District of California direct receivers, unless ordered otherwise by the court, to "administer the estate as nearly as possible in accordance with the practice in the administration of estates in bankruptcy." Central Dist. Cal. Local R. 25-8. The Bankruptcy Code establishes in 11 U.S.C. S 761 et seq. a procedure for "Commodity Broker Liquidation." Section 766 provides that "the trustee shall distribute customer property ratably to customers on the basis and to the extent of such customers' allowed net equity claims.... " 11 U.S.C. S 766(h). Section 761(17) makes "net equity" "subject to such rules and regulations as the Commission [CFTC] promulgates under the Act [CEA]." The CFTC's own rules provide, under the title "Bucketed contracts," that "[t]he value of a commodity contract which has not been established in fact shall be deemed to be equal to the value of the total deposit made by a customer in respect to such contract." 19 C.F.R. S 190.07(e)(3).
 
 
 50
 Because the Receiver had concluded that the lack of any customer records was consistent with the Conclusion that Topworth "bucketed" trades, that is, took into its own account the other side of a trade without actually executing the order on an exchange or crediting the sale or purchase to a custom er's account, it was appropriate for the Receiver to follow the CFTC's rules for establishing net equity and within the district court's broad discretion to approve it. See United States v. Real Property Located at 13328 and 13324 State Highway 75 N., 89 F.3d 551, 553-54 (9th Cir. 1996) (affirming allocation of proceeds of disgorged property pro rata to victims of a fraudulent investment scheme, regardless of whether claimants can trace their funds, because "the equities demand[ ] that all victims of the fraud be treated equally"); United States v. Durham, 86 F.3d 70, 73 (5th Cir. 1996), (affirming district court's refusal to give preferential treatment to claimants who could trace their funds in fraudulent loan brokerage business as a "use[ of] its discretion in a logical way to divide the money"); In re Trending Cycles for Commodities, Inc., 27 B.R. 709, 710 (Bankr. S. D. Fla. 1983) (in "a pool operation, [in which] there is no record of any specifically identifiable property held for any specific customer," court approves distribution plan "based upon an amount equal to the total outof-pocket deposit made by a customer minus withdrawals with respect to such contracts" under a rescission/restitution theory (quotations omitted)).
 
 
 51
 The district court's approval of the Receiver's distribution plan was within its broad discretion.
 
 
 52
 AFFIRMED.
 
 
 
 NOTES:
 
 
 [1]
 Because Advani was brought into the proceedings by the Receiver's notice indicating that Advani would forfeit his right to recover anything from Topworth unless he filed a claim, and by the later schedule requiring him to file a written objection or waive it, this case is distinguishable from Marino v. Ortiz, 484 U.S. 301 (1988) (per curiam) (nonparties did not have standing to appeal consent decree where they had not moved to intervene in state court). See Keith v. Volpe, 118 F.3d 13886, 1391 n.7 (9th Cir. 1997) (nonparty may appeal when haled into court).
 
 
 [2]
 We express no opinion as to mixed trading cases in which sufficient records are available to segregate and trace trading in regulated and exempt futures.