**COMMUNITY FIRST BANK, a Wisconsin banking corporation, Respondent,**

v.

**FIRST UNITED FUNDING, LLC, Defendant,**

**Lighthouse Management Group, Inc., as Receiver for First United Funding, LLC, Respondent,**

**Corey N. Johnston, Respondent,**

**Hillcrest Bank, a Kansas banking corporation, Respondent,**

v.

**Community Financial Bank, a Wisconsin banking corporation, intervenor, Respondent,**

**Community State Bank of Prentice, a Wisconsin banking corporation, intervenor, Respondent,**

**Choice Financial Group, intervenor, Respondent,**

**MinnWest Bank Luverne, intervenor, Respondent,**

**First International Bank and Trust, a North Dakota banking corporation, intervenor, Respondent,**

**Maple Bank, intervenor, Respondent,**

**The Bank, Weatherford Texas, intervenor, Respondent,**

**LNV Corporation, intervenor, Respondent,**

**Republic Bank of Chicago, intervenor, Respondent,**

**The National Bank, intervenor, Appellant,**

v.

**John Doe, et al., Additional Defendants,**

and

Western National Bank, Respondent,

v.

First United Funding, LLC, Defendant,

Lighthouse Management Group,
as Receiver for First United
Funding, LLC, Respondent.

No. A12–40.

Court of Appeals of Minnesota.

July 16, 2012.

T. Chris Stewart, Anastasi & Associates, Stillwater, MN, for respondent Community First Bank.

Ryan T. Murphy, Joseph J. Cassioppi, Fredrikson & Byron, P.A., Minneapolis, MN, for respondents Lighthouse Management Group, Inc., receiver for First United Funding, LLC and Non–Exempt assets of Corey N. Johnston.

Robert L. Meller, Jr., Best & Flanagan, LLP, Minneapolis, MN, for Hillcrest Bank.

Community Financial Bank, Prentice, WI, respondent.

Community State Bank of Prentice, Prentice, WI, respondent.

Tracy A. Kennedy, Zimney Foster, P.C., Grand Forks, ND, respondent Choice Financial Group.

Kathryn J. Bergstrom, Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, respondent Minnwest Bank Luverne.

Kevin D. Hofman, Halleland Habicht, P.A., Minneapolis, MN, and Kirstin D. Kanski, Lindquist & Vennum, P.L.L.P., Minneapolis, MN, for respondent First International Bank and Trust.

Maple Bank, Champlin, MN, respondent.

Steven M. Phillips, Anthony Ostlund Baer & Louwagie, P.A., Minneapolis, MN, for respondent The Bank, Weatherford, Texas.

LNV Corporation, respondent.

Mychal A. Bruggeman, Shane H. Anderson, Mackall, Crounse & Moore, PLC, Minneapolis, MN, for respondent Republic Bank of Chicago.

Timothy W. Waldeck, Lindsey J. Woodrow, Waldeck & Lind, P.A., Minneapolis, MN, and

Richard A. Davidson (pro hac vice), Lane & Waterman LLP, Davenport, IA, for appellant.

Patrick W. Michenfelder, Gries & Lenhardt, P.L.L.P., St. Michael, MN, for respondents Chez & Tabes, LLC, Brian Carney, and Edwad Rapee.

Lowell P. Bottrell, Fargo, ND, for respondent Bank Forward.

Kevin M. Busch, Moss & Barnett, Minneapolis, MN, for respondent Border State Bank.

Charter Bank, Eau Claire, WI, respondent.

David Galle, Oppenheimer Wolff & Donnelly, Minneapolis, MN, for respondent CLMG Corp.

William F. Stute, Jr., Faegre Baker Daniels LLP, Minneapolis, MN, for respondent Western National Bank.

Brett M. Larson, Saliterman & Siefferman, P.C., Minneapolis, MN, for respondent Corey N. Johnston.

First Southern National Bank, respondent.

Labette Bank, respondent.

Sonoran Bank, N.A., respondent.

Mortgage Electronic Registration Systems, Inc., respondent.

Considered and decided by SCHELLHAS, Presiding Judge; KALITOWSKI, Judge; and CHUTICH, Judge.

## OPINION

CHUTICH, Judge.

Appellant, The National Bank (National Bank), appeals the district court's distribution of funds recovered from a Ponzi scheme under a net-investment distribution method. Because the district court did not abuse its discretion in selecting that method, we affirm.

## FACTS

Beginning in 2002, First United Funding, LLC (First United) and Corey Johnston sold loan participations to banks, promising impressive returns. A loan participation is a common banking practice in which a bank participant provides funds to a lender, which then lends the funds to a borrower. First United and Johnston were, in fact, conducting a fraudulent scheme by overselling the loan partic-

ipations. First United and Johnston sold participations to banks that had already been sold to other banks and sold participations in nonexistent loans. Early bank participants were paid with funds deposited by later participants, until the scheme inevitably collapsed. In August 2010, the United States Attorney's Office for the District of Minnesota indicted Johnston on charges related to operating a Ponzi scheme.[1] Johnston pleaded guilty and was sentenced to six years in prison.

In September 2009, Community First Bank, a victim of the Ponzi scheme, commenced this action, seeking a temporary restraining order and appointment of a receiver. The suit expanded to include 19 victim banks that collectively were owed approximately $135 million in unpaid principal, interest, and fees. In October 2009, the district court appointed Lighthouse Management Group, Inc. (Lighthouse or the receiver) as the receiver to recover and to liquidate assets to pay the participant banks' outstanding claims.

The receiver recommended, and the district court approved, a pro rata distribution method with the goal of treating all participant banks "equitably as they relate to each other." The banks, however, disagreed over the specific type of pro rata method that the receiver should use to calculate the distributions—the net-investment method or the principal-and-interest method. Under the net-investment method, a bank's claim amount is based on the amount a bank has invested, minus any funds it has recovered. Every dollar that First United had paid a bank is subtracted

from the bank's principal investment, regardless of whether it was considered an interest or principal payment when the payment was made. The principal-and-interest method, by contrast, bases a bank's claim on the amount each bank was owed on the date that the receiver was appointed. Under both methods, the receiver would then determine each bank's ratable, or proportional, distribution, based on the ratio of the bank's individual claim to the total claims.

The receiver's method of calculating the banks' claims has a major impact on the amount to be recovered by some of the banks. This difference is caused by the varying amounts of interest and fees that the banks had collected over the course of dealing with First United. For example, banks that invested with First United for long periods of time, such as National Bank, have received more interest and fee payments. Under the net-investment method, all those payments would be deducted from their claim amount.[2] By contrast, banks that more recently invested with First United, such as Republic Bank of Chicago (Republic Bank), did not receive many interest and fee payments. Their claims, under the net-investment method, would therefore be closer to their initial investment amounts.

Lighthouse ultimately proposed a net-investment distribution plan. After an evidentiary hearing, multiple rounds of briefing, and several oral arguments concerning the method of distribution, the district court entered final judgment approving

---

1. Named after Charles Ponzi, an infamous Boston swindler, a "Ponzi Scheme" is a term for a fraudulent plan where money taken from later participants is paid to earlier participants to create the false appearance that the scheme is generating returns. *See Cunningham v. Brown*, 265 U.S. 1, 7–9, 44 S.Ct. 424, 425–26, 68 L.Ed. 873 (1924).

2. Under the principal-and-interest method, National Bank's claim would be approximately $18.3 million and it would likely recover $10.4 million, whereas under the net-investment method, National Bank's claim would be approximately $10 million and it would likely recover $8.6 million.

the net-investment distribution method. National Bank now appeals, challenging the district court's adoption of the receiver's net-investment distribution method and the final calculations. Republic Bank and the receiver filed responsive briefs, arguing for affirmance.

## ISSUE

Did the district court abuse its discretion by approving the receiver's net-investment distribution method and claims calculations for compensating victims of a Ponzi scheme?

## ANALYSIS

■ A receivership is an equitable remedy, in which the court has the discretion "to do what is best for all concerned." *Minn. Hotel Co., Inc. v. ROSA Dev. Co.,* 495 N.W.2d 888, 893 (Minn.App.1993). We review the district court's equitable determinations for an abuse of discretion. *City of N. Oaks v. Sarpal,* 797 N.W.2d 18, 23 (Minn.2011). An abuse of discretion occurs if the district court disregards facts or the applicable principles of equity. *See Edin v. Jostens, Inc.,* 343 N.W.2d 691, 693 (Minn.App.1984).

■ Minnesota caselaw does not specifically address distribution methods to remedy a Ponzi scheme; federal courts, however, have reviewed such decisions for an abuse of discretion. *Quilling v. Trade Partners, Inc.,* 572 F.3d 293, 298 (6th Cir. 2009); *S.E.C. v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 331 (5th Cir.2001); *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.,* 205 F.3d 1107, 1115 (9th Cir. 1999); *see also Sonenstahl v. L.E.L.S., Inc.,* 372 N.W.2d 1, 4 (Minn.App.1985) (stating "federal decisions may be persuasive where the Minnesota courts have not addressed a particular subject"). In such proceedings, the appellate court "affords broad deference to the court's supervisory role." *Topworth,* 205 F.3d at 1115 (quotation omitted).

## Propriety of the Net–Investment Distribution Method

Here, insufficient funds are available for the participant banks to recover the full amount of their original investments; the district court had to determine, therefore, an equitable way to distribute the available funds among the banks. The district court concluded that a "net investment plan would provide a more equitable distribution of assets to the participants than a [principal] and interest plan." *See S.E.C. v. Byers,* 637 F.Supp.2d 166, 168 (S.D.N.Y. 2009) (finding that a distribution plan should be approved if it is fair and reasonable). Federal courts have approved receivership distribution based on the net-investment methodology in similar situations. *See, e.g., id.* at 182; *Topworth,* 205 F.3d at 1116. National Bank asserts a variety of arguments as to why the district court abused its discretion in approving the net-investment method.

### Legitimate Profits

■ First, National Bank contends that the district court erred by not considering $84.6 million that First United made in "legitimate profits" during the Ponzi scheme. National Bank asserts that it should not have these profits treated as a reduction of its principal under the net-investment method. The receiver counters that National Bank misconstrues the record by calling the $84 million profit, stating: "[T]he $84 million figure is revenue, not income, and is dwarfed by the losses First United sustained on loans and funds withdrawn by Johnston to fund his lavish lifestyle."

The record demonstrates that the district court carefully considered National Bank's argument, acknowledging that

First United may have had some legitimate revenue: "[S]ome of the earlier investors realized 'legitimate profits' during the course of their dealings with First United, not in the sense that they realized a net gain, but in the sense that their investments accrued some interest." Beginning in 2002, however, First United did not have sufficient cash to operate the business without its fraudulent activity. The receiver determined that, without the Ponzi scheme, "no loans would have been funded and no revenues would have been generated from any loans."

Because of the pervasive nature of the fraud, the district court determined that the net-investment method was the most equitable distribution method:

> For the same reasons that a *pro rata* distribution was embraced in general terms, it would be inequitable to reward the parties who were fortunate enough to experience "legitimate" profits in the midst of a pervasive fraud.
>
> ... [I]t would be inequitable to separate the "legitimate" and "illegitimate" activities of First United, and to functionally trace the alleged profits of the victims. Rather, it is better to view each of the parties as similarly situated, victims of a scheme whereby the fraudster indiscriminately worked towards a dishonest end.

Under the principal-and-interest method advocated by National Bank, every dollar that one bank would be allowed to count as "legitimate profit" would be a dollar that another bank would not receive as repayment of its principal investment. *See In re Bernard L. Madoff Inv. Secs. LLC*, 424 B.R. 122, 141 (Bankr.S.D.N.Y.2010) ("Any dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested."). Based on

the factual circumstances, the district court did not abuse its discretion by adopting the net-investment method. *See, e.g., Byers*, 637 F.Supp.2d at 181–82 (approving net-investment distribution method when Ponzi scheme had some legitimate profits).[3]

To support its argument that the district court erred in adopting the net-investment method and ignoring legitimate profits, National Bank relies heavily on *Beacon Associates Management Corp. v. Beacon Associates LLC I*, 725 F.Supp.2d 451 (S.D.N.Y.2010). We do not find *Beacon* persuasive. First, the facts in *Beacon* differ markedly from the fraud that occurred here. Beacon was a legitimate investment fund that had invested approximately 70% of its assets in the Madoff Ponzi scheme. *Id.* at 454. It invested its remaining assets in other unrelated legitimate funds. *Id.* By contrast, First United was itself a Ponzi scheme.

Second, the *Beacon* court did not conclude that a principal-and-interest distribution method was the proper distribution method because there were some legitimate profits, as National Bank argues. Rather, the court noted that, because there were some legitimate profits, there were downfalls to both of the proposed distribution methods: "[W]hile application of the Valuation Method allows Madoff-related 'fictitious profits' to inflate member interests, application of the Net Investment Method would strip investors of legitimate gains from Beacon's significant non-Madoff investments." *Id.* at 464. Ultimately, the court held that it was bound by the parties' operating agreement, not principles of equity, to adopt the valuation method for distributions. *Id.* Thus, *Beacon* does not limit the district court's dis-

---

**3.** Additionally, because the funds were comingled, National Bank was unable to establish that the particular payments it received are traceable to legitimate revenue.

cretion in choosing among pro rata distribution methods in this case.

### Principles of Equity

National Bank also argues that the district court failed to follow principles of equity by adopting an inequitable distribution method that preferred certain banks, namely the ones that had more recently invested with First United, over other banks.[4] While the net-investment method may favor some banks in application, the principal-and-interest method advocated by National Bank would favor National Bank and other banks that had dealt with First United for a longer period of time. Based on the receiver's calculations, ten banks would have a greater recovery under National Bank's preferred approach, the principal-and-interest method, while nine banks would have a greater recovery under the net-investment method ultimately chosen. As the district court noted, "no matter which [distribution method] is chosen, some of the parties' expectations will have been frustrated, whether with respect to their original investments or with respect to their expected 'legitimate' earnings that accumulated over the course of their relationship with First United."

After careful consideration of the facts and circumstances of the victim banks, the district court approved a methodology that it believed would treat "each of the parties as similarly situated victims." See S.E.C. v. Wang, 944 F.2d 80, 81 (2d Cir.1991) (stating that the district court should adopt a distribution plan that is "fair and reasonable"); Cunningham v. Brown, 265 U.S. 1, 13, 44 S.Ct. 424, 427, 68 L.Ed. 873 (1924) ("[E]quality is equity."). The net-investment method treated banks equally by allowing them to recover an equal percentage of their remaining net-investment. See In re Madoff, 424 B.R. at 142 ("In this way, the Net Investment Method brings the greatest number of investors closest to their positions prior to [the Ponzi] scheme in an effort to make them whole."). The district court exercised its broad discretion by choosing the distribution method it found to be most equitable. See United States v. Durham, 86 F.3d 70, 72–73 (5th Cir.1996) (stating that the district court did not abuse its discretion by choosing one of two possible distribution methods).[5]

### Modified Net–Investment Method

National Bank proposed a modified net-investment method that it believed more "fairly and equitably" distributed the funds recovered by the receiver. National Bank

---

4. National Bank cites extensive Minnesota caselaw for the proposition that creditors are entitled to a ratable distribution of an insolvent bank's assets. We note that this case does not present a typical debtor-creditor relationship because the banks' relationships with First United were based on fraudulent agreements. More importantly, however, the district court *did* adopt a ratable distribution—the net-investment method.

5. Lighthouse initiated separate fraudulent transfer claims against banks that had conducted business with First United. In that separate action, the district court found that some of the fraudulent-transfer claims were barred by the six-year statute of limitations. National Bank argues that it is inequitable to offset its claim with interest it collected more than six years ago, when the receiver is not allowed to "claw back" interest other banks earned in that time frame. The statute of limitations is generally used as a defense to a filed lawsuit and no fraudulent-transfer claims have been asserted against National Bank. Additionally, courts in other jurisdictions have held that the statute of limitations does not prevent the court from limiting the claim of a party that is seeking *affirmative* equitable relief from the court. See In re Madoff, 424 B.R. at 136–37 (holding that statute of limitations did not prevent trustee from accounting for all transfers received by a claimant, for purposes of selecting a distribution methodology, including those that occurred outside the limitations period).

pro-rated First United's $84 million of revenue, "by allocating to each Participant Bank a pro rata share of each year's legitimate income based on the Participant Bank's cumulative net investment at the end of that year." The district court considered National Bank's proposed approach and determined that this modified net-investment method would be inequitable for the same reasons as the principal-and-interest method; it would be unfair to reward the parties who were fortunate enough to experience "legitimate profits" in the midst of a pervasive fraud. In rejecting this approach and in adopting the receiver's plan as proposed, the district court acted within its discretion. *See Forex Asset*, 242 F.3d at 331 (finding that the district court did not abuse its discretion by rejecting alternate methods after consideration); *Topworth*, 205 F.3d at 1116 (same).

The district court has broad discretion in distributing receivership assets and National Bank has failed to demonstrate that it abused that discretion by adopting the net-investment method. The district court's findings reflect a thorough understanding of the factual record and the applicable caselaw. It noted that there would be "winners" and "losers" under both distribution methods, and that "no matter which [method] is chosen, some of the parties' expectations will have been frustrated." *See Byers*, 637 F.Supp.2d at 168 ("An equitable plan is not necessarily a plan that everyone will like." (quotation omitted)). The district court conducted numerous rounds of briefing, heard multiple oral arguments, and made detailed factual findings before concluding that the net-investment method would provide the most equitable result for all the victims, a determination that is supported by the record.

National Bank advocates for the principal-and-interest method because, under that method, it would receive a greater distribution. In an unfortunate situation such as this, however, each bank's recovery comes at the expense of another victim's recovery. The district court acted within its discretion in adopting the net-investment method and finding that it would "serve the best interests of the parties." *See Durham*, 86 F.3d at 73 ("Because the court used its discretion in a logical way to divide the money, the court committed no error requiring our intervention.").

## DECISION

The district court did not abuse its discretion by adopting the net-investment distribution method to allocate funds to the victims of a Ponzi scheme.

**Affirmed.**