Patrick **FINN, et al., Respondents (A12–1930), Appellants (A12–2092),**

v.

**ALLIANCE BANK, Appellant (A12–1930), Respondent (A12–2092),**

**Home Federal Bank, Respondent (A12–2092),**

**KleinBank, Respondent (A12–2092),**

**Merchants Bank N.A., Respondent (A12–2092),**

**M & I Marshall & Ilsley Bank, Respondent (A12–2092),**

**American Bank of St. Paul, et al., Defendants.**

Nos. A12–1930, A12–2092.

Court of Appeals of Minnesota.

Sept. 3, 2013.

Review Granted Nov. 12, 2013.

---

Larry B. Ricke, Rodney Honkanen, R. John Wells, Ricke & Sweeney, P.A., St. Paul, MN, for respondents/appellants Patrick Finn, et al.

Christopher R. Morris, Jessica S. Williams, Bassford Remele, P.A., Minneapolis, MN, for appellant/respondent Alliance Bank.

Kevin M. Decker, Benjamin E. Gurstelle, Briggs and Morgan, P.A., Minneapolis, MN, for respondent Home Federal Bank.

Shari L.J. Aberle, Dorsey & Whitney LLP, Minneapolis, MN, for respondent KleinBank.

Mark A. Merchlewitz, Benson & Merchlewitz, Winona, MN, for respondent Merchants Bank N.A.

Keith S. Moheban, Peter J. Schwingler, Katherine Devlaminck, Leonard, Street and Deinard, Minneapolis, MN, for respondent M & I Marshall & Ilsley Bank.

Considered and decided by STAUBER, Presiding Judge; HOOTEN, Judge; and WILLIS, Judge.

## OPINION

WILLIS, Judge.*

These consolidated appeals arise out of a clawback action brought under the MUFTA by appellant-receiver. In one appeal (A12–2092), the receiver challenges the district court's dismissal, on statute-of-limitations grounds, of its claims brought under the MUFTA against defendant-respondents Home Federal Bank, KleinBank, Merchants Bank, and M & I Marshall & Ilsley Bank (respondent banks). In the other appeal (A12–1930), appellant Alliance Bank challenges the district court's grant of summary judgment to the receiver on its MUFTA claims against Alliance. We affirm the district court's dismissal of the receiver's constructive-fraud claims against respondent banks, reverse the district court's dismissal of the receiver's actual-fraud claims against respondent banks and the award of summary judgment against Alliance, and remand for entry of judgment dismissing the claims against Alliance and for further proceedings on the receiver's remaining actual-fraud claims against respondent banks.

## FACTS

■ Underlying these consolidated appeals are loan participations sold by First United Funding LLC and Corey Johnston to various banks and other financial institutions from 2002 to 2009.[1] During this time, First United and Johnston were engaged in a fraudulent enterprise, in which they oversold participations and sold participations in fictional loans. In 2002, First United was insolvent, and the magnitude of its insolvency increased every year

that it was in operation. To pay interest and profits to its investors, First United and Johnston used funds obtained from later investors, which, regardless of the sources, were commingled in First United's bank accounts.

Among the loan participations that First United sold were those to Alliance and respondent banks. Record evidence shows that Alliance purchased a 100% participation interest in a $3,180,000 loan that First United made to an Arizona borrower in 2002. The Arizona borrower made payments on the loan to First United from 2002 until 2007, and First United made payments to Alliance. The borrower paid off the loan in 2007, including payment of the principal and an additional $1,332,058 in interest and fees. First United, in turn, paid off Alliance's participation interest in 2008, including the principal and $1,235,388 in interest and fees, leaving First United with $96,670.

### Criminal Proceedings in Federal Court

■ In August 2010, the United States Attorney's Office for the District of Minnesota charged Johnston with bank fraud and tax fraud that was related to "operating a Ponzi scheme that resulted in a total estimated loss of $79.5 million for 17 lenders."[2] In September 2010, Johnston pleaded guilty to committing bank fraud and filing false tax returns. Johnston admitted that he "used some of the proceeds" from the oversold loan participations to "repay other loans and perpetuate the scheme" and that he also "diverted other proceeds of the fraud to his

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. "A loan participation is a common banking practice in which a bank participant provides funds to a lender, which then lends the funds to a borrower." *Cmty. First Bank v. First*

*United Funding, LLC,* 822 N.W.2d 306, 308 (Minn.App.2012).

2. A Ponzi scheme is "a fraudulent plan where money taken from later participants is paid to earlier participants to create the false appearance that the scheme is generating returns." *Cmty. First Bank,* 822 N.W.2d at 309 n. 1.

personal use and his family's use." He admitted that he ran the Ponzi scheme from 2005 until 2009.

### Procedural History of This Case

In October 2009, the Dakota County district court appointed Lighthouse Management Group as the receiver to recover and liquidate First United's remaining assets and distribute them to the banks and financial institutions that lost money by purchasing participation interests in First United loans. The receiver recommended a plan for distributing the funds recovered from First United to the banks and financial institutions. The distribution plan was appealed to this court, and we affirmed it in *Community First Bank v. First United Funding, LLC*, 822 N.W.2d 306, 309 (2012). In December 2009, the district court expanded the scope of the receiver's appointment and authorized it to "[i]nvestigate and pursue any and all claims that First United or the Receiver may have against any third party, including but not limited to, fraudulent transfer and illegal distribution claims."

The receiver commenced this action in May 2011, seeking to claw back profits received by respondent banks and Alliance. The receiver alleged that First United's Ponzi scheme began in 2002 and ended in 2009, that Alliance and respondent banks purchased loan participations from First United between 2002 and 2004, that "all, or nearly all, of the participation interests sold" by First United were involved in First United's Ponzi scheme, and that Alliance and respondent banks made a profit from their investments in the Ponzi scheme. The receiver also alleged that First United's payments to Alliance ended in 2008, and its payments to respondent banks ended, at the latest, in March 2005. The receiver's complaint brought, relevant to this appeal, four claims against Alliance

and respondent banks: (1) that the payments made by First United to Alliance and respondent banks were voidable as actually fraudulent transfers, under Minn. Stat. § 513.44(a)(1); (2) that the payments were voidable as constructively fraudulent transfers, under Minn.Stat. §§ 513.44(a)(2), .45(a) (2012); and (3) that Alliance and respondent banks were unjustly enriched. The receiver did not allege that the loans underlying Alliance's or respondent banks' participations were fraudulent, fictional, or oversold in any fashion.

Alliance and respondent banks moved to dismiss under Minn. R. Civ. P. 12.02(e), arguing that the receiver's claims were barred by the statute of limitations and, moreover, that they failed to state a claim upon which relief could be granted. The district court dismissed the receiver's unjust-enrichment claims against all parties; concluded that the statute of limitations allowed the receiver to claw back only transfers made after May 11, 2005; granted respondent banks' motion to dismiss all of the receiver's MUFTA claims against them as being time-barred because First United made no transfers to respondent banks after May 11, 2005; granted in part Alliance's motion to dismiss on the ground of the statute of limitations, allowing the receiver to proceed on its claims to recover transfers First United made to Alliance after May 11, 2005; and denied Alliance's motion to dismiss the receiver's remaining claims for failure to state a claim upon which relief can be granted. Alliance and the receiver subsequently filed cross-motions for summary judgment. The district court granted the receiver's motion and directed entry of judgment against Alliance in the amount of $1,235,388.

This appeal follows.

## ISSUES

I. What statute of limitations applies to the receiver's actual- and constructive-fraud claims against respondent banks brought under the MUFTA?

II. Did the district court err in ruling on the parties' dispositive motions on the merits of the MUFTA claims?

## ANALYSIS

### I. Actual-fraud claims under the MUFTA are governed by the statute of limitations in Minn.Stat. § 541.05, subd. 1(6); constructive-fraud claims under the MUFTA are governed by the statute of limitations in Minn. Stat. § 541.05, subd. 1(2).

■ The district court dismissed the receiver's actual- and constructive-fraud claims against respondent banks on the ground that they were untimely. The receiver contends that the district court erred because it applied the wrong statute of limitations. An appellate court reviews the "construction and application of a statute of limitations, including the law governing the accrual of a cause of action, de novo." *Park Nicollet Clinic v. Hamann,* 808 N.W.2d 828, 831 (Minn.2011) (quotation omitted).

■ Unlike the Uniform Fraudulent Transfer Act (the UFTA) from which it derives, the MUFTA does not contain a statute of limitations. *See* Minn.Stat. §§ 513.41–.51 (2012).[3] Moreover, there is no published appellate authority determining what statute of limitations applies to claims brought under the MUFTA. The district court concluded that the six-year statute of limitations in Minn.Stat.

3. The UFTA provides a 4-year statute of limitations for actual- and constructive-fraud claims, but allows the former to be brought "within one year after the transfer or obligation was or could reasonably have been discovered." Unif. Fraudulent Transfer Act § 9(a), 7A U.L.A. 194 (2006). The vast majority of states that adopted the UFTA have incorporated, with some modification, the statutes of limitations provided by the Uniform Act. *See* Ariz.Rev.Stat. Ann. § 44–1009 (2013); Cal. Civ.Code § 3439.09 (West 2013); Colo. Rev.Stat. § 38–8–110 (2012); Conn. Gen.Stat. § 52–552j (2012); Del.Code Ann. tit. 6, § 1309 (2005); D.C.Code § 28–3109 (LexisNexis 2012); Fla. Stat. Ann. § 726.110 (West 2012); Ga.Code Ann. § 18–2–79 (2010); Haw.Rev.Stat. § 651C–9 (1993); Idaho Code Ann. § 55–918 (2007); 740 Ill. Comp. Stat. Ann. 160/10 (West 2010); Ind.Code Ann. § 32–18–2–19 (LexisNexis 2002); Iowa Code §§ 684.4, .9 (2001) (adopting the UFTA's discovery provision, changing time limit to five years rather than four); Kan. Stat. Ann. § 33–209 (2000); Me.Rev.Stat. Ann. tit. 14, § 3580 (2003) (adopting the UFTA's discovery provision, changing time limit to six years rather than four); Mass. Ann. Laws ch. 109A, § 10 (LexisNexis 2005); Mich. Comp. Laws §§ 566.39, 600.5813, .5855 (2012) (applying six-year statute of limitations with discovery provision that applies to constructive and actual-fraud claims if defendant fraudulently conceals the existence of the claim); Miss. Code Ann. § 15–3–115 (2012) (adopting the UFTA's discovery provision, changing time limit to three years); Mo. Ann. Stat. § 428.049 (West 2010); Mont.Code Ann. § 31–2–341 (2011) (lengthening the discovery provision to two years); Neb.Rev.Stat. § 36–710 (2008); Nev.Rev.Stat. § 112.230 (2011); N.H.Rev.Stat. Ann. § 545–A:9 (2007); N.J. Stat. Ann. § 25:2–31 (West Supp.2013); N.M. Stat. Ann. § 56–10–23 (2012); N.C. Gen.Stat. § 39–23.9 (2011); N.D. Cent.Code § 13–02.1–09 (2009); Ohio Rev.Code Ann. § 1336.09 (LexisNexis 2012); Okla. Stat. Ann. tit. 24, § 121 (2008); Or.Rev.Stat. § 95.280 (2011); 12 Pa. Cons.Stat. Ann. § 5109 (1999); R.I. Gen. Laws § 6–16–9 (2001); S.D. Codified Laws § 54–8A–9 (2004); Tenn.Code Ann. § 66–3–310 (2004); Tex. Bus. & Com.Code Ann. § 24.010 (2009); Utah Code Ann. § 25–6–10 (LexisNexis 2007); Vt. Stat. Ann. tit. 9, § 2293 (2006); Wash. Rev.Code Ann. § 19.40.091 (West 2013); W. Va.Code Ann. § 40–1A–9 (LexisNexis 2010); Wis. Stat. §§ 242.04(1), 893.425 (2011–12); Wyo. Stat. Ann. § 34–14–210 (2013).

§ 541.05, subd. 1(2)—which provides that "actions ... upon a liability created by statute" must be commenced within six years—applies to the receiver's MUFTA claims and that the receiver could claw back only transfers made after May 11, 2005, whether based on actual or constructive fraud. Therefore, the district court dismissed the receiver's MUFTA claims against respondent banks because all of First United's payments to respondent banks occurred before May 11, 2005. The receiver concedes that its claims against respondent banks would be time-barred under the statute of limitations in section 541.05, subdivision 1(2). But the receiver argues that the district court erred because the statute of limitations that applies to its MUFTA claims is that provided in section 541.05, subdivision 1(6), which applies to actions for "relief on the ground of fraud" and which also provides a six-year statute of limitations, but one that does not begin to run "until the discovery by the aggrieved party of the facts constituting the fraud."

The district court relied on *McDaniel v. United Hardware Distributing Co.*, in which the Minnesota Supreme Court stated that section 541.05, subdivision 1(2), "applies to liabilities imposed by statute, not to liabilities existing at common law which have been recognized by statute." 469 N.W.2d 84, 85 (Minn.1991). In *McDaniel*, the supreme court considered the question of what statute of limitations applied to an employee's action for retaliatory discharge brought under Minn.Stat. § 176.82 (1990), which created "causes of action for retaliatory discharge and for intentional obstruction of an employee seeking workers' compensation benefits." *Id.* The supreme court noted that the "legislature enacted section 176.82 more than a decade before [the supreme] court recognized a common law action for retaliatory discharge in violation of public policy" and

that section 176.82 "grant[ed] specific rights and remedies, not previously recognized, to employees." *Id.* at 85–86 (citing *Phipps v. Clark Oil & Ref. Corp.*, 408 N.W.2d 569, 571 (Minn.1987), in which the supreme court held that "an employee may bring an action for wrongful discharge if that employee is discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law"). The court concluded that section 541.05, subdivision 1(2), the statute for liabilities imposed by statute, applied to claims brought under section 176.82. *Id.*

Based on *McDaniel,* the district court here concluded that claims brought under the MUFTA are actions for liabilities imposed by statute, rather than liabilities that existed at common law, because the MUFTA "has not merely enlarged a common law scheme or granted additional remedies" but rather "provides relief from acts that may not have formerly risen to the level of fraud at all." The district court's decision is based on the changes that occurred between Minnesota's original fraudulent-transfer statute and the enactment of the MUFTA. Minnesota's original fraudulent-transfer statute was a codification of common law. *Blackman v. Wheaton,* 13 Minn. 326, 330, 13 Gil. 299, 303 (1868) ("The statute of 13 *Eliz., c.* 5, and the statute of our State rendering void certain conveyances made with fraudulent intent, are but declaratory of the common law."). Under the original fraudulent-transfer statute, the statute of limitations did not begin to run on a cause of action for fraudulent conveyance until the aggrieved party discovered the fraud. *Duxbury v. Boice,* 70 Minn. 113, 120, 72 N.W. 838, 839–40 (1897). In 1921, Minnesota adopted the Uniform Fraudulent Conveyance Act (the MUFCA). 1921 Minn. Laws

ch. 415, §§ 1–15, at 642–44. As noted by the district court, there are several differences between Minnesota's original fraudulent-transfer statute and the MUFCA.

The first difference noted by the district court is that the supreme court interpreted the MUFCA as providing a definition of "creditor" that was "broad enough to embrace a party without a judgment." *Lind v. O.N. Johnson Co.*, 204 Minn. 30, 38–39, 282 N.W. 661, 666–67 (1938). In contrast, under common law, only a judgment creditor could seek relief. *Wadsworth v. Schisselbauer*, 32 Minn. 84, 86–87, 19 N.W. 390, 390–91 (1884). The receiver argues that the MUFCA provision that allowed creditors to bring a claim without first obtaining a judgment did not create new liabilities, as required for actions based "upon a liability created by statute." Minn.Stat. § 541.05, subd. 1(2). The receiver's argument is persuasive. Liability is the "quality or state of being legally obligated or accountable; legal responsibility to another or to society." *Black's Law Dictionary* 997 (9th ed.2009). The provision allowing a creditor to bring an action under the MUFCA without first obtaining a judgment did not create legal accountability or an obligation, it merely expedited the process by which a creditor can obtain relief. *See Lind*, 204 Minn. at 40, 282 N.W. at 667 ("The [MUFCA] simply adds an efficient, optional, and additional remedy to a creditor who has not reduced his claim to judgment. . . . Such construction does not vest in the judgment creditor any new rights or remedies not theretofore his.").

■ The second difference that the district court noted between the original fraudulent-transfer statute and the MUFCA is that constructively fraudulent transfers were not actionable under the original statute. "Constructive fraud is, by definition, not actual fraud but conduct that the law treats as fraud, irrespective of the

actor's intent or motive." *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 213 (Minn.1984). Under the original statute, a plaintiff was required to prove that the transferor had an actual intent to defraud. *Underleak v. Scott*, 117 Minn. 136, 141, 134 N.W. 731, 733 (1912) ("There must be fraud in fact [for a plaintiff to succeed on a fraudulent-transfer claim], as distinguished from the constructive fraud that is sufficient where it is so provided in the bankruptcy act."). In contrast, under the MUFCA some conveyances were voidable regardless of whether they were made with fraudulent intent. *See, e.g.*, Minn. Stat. § 8478 (1927) ("Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to . . . actual intent if the conveyance is made or the obligation is incurred without a fair consideration."). Similarly, the MUFTA includes causes of action that do not require actual intent to defraud. 1987 Minn. Laws ch. 19, §§ 1–12, at 28–35; Minn.Stat. §§ 513.44(a)(2), .45(a).

The receiver argues that Minnesota had previously recognized constructive-fraudulent-transfer claims and therefore MUFCA's incorporation of constructive-fraud claims did not create a new liability. To support its argument, the receiver cites cases in which the supreme court noted that the debtor's intent to defraud could be implied from the circumstances at the time of the fraud, for example, when the debtor was insolvent at the time of the transfer. *See, e.g., Underleak*, 117 Minn. at 141, 134 N.W. at 733 (stating that fraudulent intent could be "implied conclusively from the circumstances surrounding the transfer, as where a debtor is insolvent, or fails to retain sufficient property to amply satisfy existing claims against him"). But "[i]n such cases . . . the direction of the court is

not based upon the proposition that the transaction was a fraud in law (whatever this term may mean), but on the proposition that the evidence conclusively shows that the transaction was in fact fraudulent." *Nat'l Sur. Co. v. Wittich,* 184 Minn. 44, 47–48, 237 N.W. 690, 692 (1931) (quotations omitted). Moreover, the implication of the debtor's fraudulent intent was rebuttable. *See Henry v. Hinman,* 25 Minn. 199, 201 (1878) (concluding that under common law when a debtor transferred property that left him insolvent, the transfer created "a clear *prima-facie* case of an intent to defraud creditors—one which requires strong evidence to overcome"); *see also Wetherill v. Canney,* 62 Minn. 341, 341, 347, 64 N.W. 818, 818, 820 (1895) (noting that one of the debtor-transferors was insolvent at the time the transfer was made but "assuming that this finding is supported by the evidence, the inference, in view of the other facts found, does not inevitably follow that [the debtor] intended to defraud the plaintiff"). Therefore, under Minnesota's original fraudulent-transfer statute, courts did not treat a debtor's transfers that rendered him insolvent or left him with insufficient property to satisfy claims against him as fraudulent "irrespective of the actor's intent or motive." *Perl,* 345 N.W.2d at 213. Rather, courts considered the circumstances surrounding the transfer as evidence of the debtor's intent to defraud his creditors.

The district court correctly concluded that the MUFTA, like the MUFCA before it, differs from the original iteration of Minnesota's fraudulent-transfer statute, which simply codified common law, because it includes claims for constructive fraud. *See* Minn.Stat. § 8478 (providing that debtor's transfer was voidable regardless of actual intent if transfer rendered debtor insolvent or debtor did not receive fair consideration for transfer); *Wittich,* 184 Minn. at 46–47, 237 N.W. at 691–92

(noting that a transfer made by a debtor, who did not have intent to defraud, that left debtor unable to pay his existing debts would "not stand if seasonably attacked" under the MUFCA, but under the law preceding the MUFCA, the "intent by the grantor to hinder, delay, or defraud his creditors is a necessary element" (quotation omitted)); *see also Neal v. Clark,* 75 Ariz. 91, 251 P.2d 903, 905–06 (1952) (noting that "the Uniform Fraudulent Conveyance Act is declaratory of the common law . . . with the exception that under the Act certain conveyances are declared to be fraudulent regardless of any actual intent to defraud"). Therefore, the receiver's constructive-fraud claims are "actions . . . upon a liability created by statute," which the receiver was required to commence within six years after the constructively fraudulent transfer occurred. Minn.Stat. § 541.05, subd. 1(2). The district court correctly dismissed as time-barred all of the receiver's constructive-fraud claims that seek to void transfers made before May 11, 2005.

■ The receiver argues that even if its constructive-fraud claims are subject to the statute of limitations in section 541.05, subdivision 1(2), its actual-fraud claims are subject to section 541.05, subdivision 1(6), and are not time-barred because the MUFTA merely codifies actual-fraud claims that existed at common law. We agree. A claim for actual fraud brought under the MUFTA is a cause of action that existed at common law. *Compare Baldwin v. O'Laughlin,* 28 Minn. 544, 548–49, 11 N.W. 77, 78–79 (1881) (stating common-law rule that "[t]o make a debtor's transfer of property fraudulent, as respects his creditors, there must be an intent to defraud, express or implied, and an act which, if allowed to stand, will actually defraud them by hindering, delaying, or preventing the collection of their claims")

*with* Minn.Stat. § 513.44(a)(1) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay, or defraud any creditor of the debtor...."). An actual-fraud claim brought under the MUFTA is based on a codification of common law, not an action on a liability created by a statute. *See McDaniel,* 469 N.W.2d at 85 (noting that section 541.05, subdivision 1(2), does not apply to "liabilities existing at common law which have been recognized by statute"); *see also* 51 Am.Jur.2d *Limitation of Actions* § 103 (2011) ("The limitation period for an action upon a liability created by statute, however, does not apply if the action is based on a statute which merely codifies or implements an existing liability at common law, or when a statute merely affords relief for certain violations of existing common-law rights." (footnote omitted)). The receiver's actual-fraud claims are subject to the statute of limitations in section 541.05, subdivision 1(6), and therefore "the cause of action shall not be deemed to have accrued until the discovery ... of the facts constituting the fraud," and the district court erred by holding that the receiver's actual-fraud claims seeking to void transfers made before May 11, 2005, were time-barred by the statute of limitations in section 541.05, subdivision 1(2).

Our conclusion that a constructive-fraud claim brought under the MUFTA is subject to the statute of limitations in section 541.05, subdivision 1(2), and an actual-fraud claim brought under the MUFTA is subject to the statute of limitations in section 541.05, subdivision 1(6), is supported by the supreme court's decision in *Olesen v. Retzlaff,* 184 Minn. 624, 627, 238 N.W. 12, 14 (1931). In *Olesen,* the supreme court considered what limitations period applied to claims brought under a statute that made it an offense for directors of

banks to receive deposits when they knew, or had good reason to know, that the banks receiving the deposits were insolvent. 184 Minn. at 626–27, 238 N.W. at 13–14. The plaintiff argued that the limitations period in the predecessor to section 541.05, subdivision 1(6), applied to his claim. *Id.* at 627, 238 N.W. at 14. The supreme court disagreed, noting that to "make a cause of action it was not necessary to allege actual fraud or fraud which conceivably might be actionable at common law" but that "[s]imple disobedience to the statute brings liability without the existence of other wrongdoing." *Id.* at 627–28, 238 N.W. at 14. The court reasoned that "[t]here is no such action as this at common law" and concluded that the statute of limitations in the predecessor to section 541.05, subdivision 1(2)—that is, the limitations period for actions brought on a liability created by statute—applied because there was "no actual fraud ... only an offended state policy." *Id.* at 628–29, 238 N.W. at 14.

Similar to the claim brought in *Olesen,* a constructive-fraud claim brought under the MUFTA does not require a plaintiff to assert fraudulent intent on the part of the defendant. *See* Minn.Stat. §§ 513.44(a)(2), .45 (listing the elements of a constructive-fraud claim, not including fraudulent intent on part of the debtor-transferor). Moreover, as already discussed, a constructive-fraud claim brought under the MUFTA is not a liability that existed at common law and has subsequently been recognized by statute because it does not require a plaintiff to assert fraudulent intent on the part of the defendant. In contrast, an actual-fraud claim brought under the MUFTA does require a plaintiff to assert that the debtor had actual fraudulent intent. Minn.Stat. § 513.44(a)(1). Such a claim existed at common law.

We conclude that the district court properly dismissed all of the receiver's constructive-fraud claims for transfers that occurred before May 11, 2005, and affirm that part of its ruling. But the district court erred by applying Minn.Stat. 541.05, subdivision 1(2), to the receiver's actual-fraud claims; we reverse that part of the district court's ruling and remand for consideration of whether the receiver's actual-fraud claims are time-barred by the statute of limitations in section 541.05, subdivision 1(6), which applies to actions brought on the grounds of fraud.[4]

## II. The district court erred by granting summary judgment to the receiver on its claims against Alliance, but did not err by denying respondent banks' motions to dismiss.

In addition to moving for dismissal on statute-of-limitations grounds, the parties seek review of the district court's ruling on dispositive motions that the parties brought on the merits of the MUFTA claims. Alliance and the receiver filed cross-motions for summary judgment on the MUFTA claims that survived the district court's statute-of-limitations ruling. The district court granted the receiver's motion and denied Alliance's. Respondent banks moved, in the alternative, to dismiss the receiver's claims under the MUFTA for failure to state a claim. The district court did not address this alternative basis for dismissal. On appeal, Alliance asserts that the district court erred by entering summary judgment in favor of the receiver and that it is entitled to summary judgment dismissing the remaining claims against it. Respondent banks assert that, even if this court rejects the district court's statute-of-limitations analysis, the dismissal of the MUFTA claims against them should be affirmed on the merits. We review each of these issues de novo. *McKee v. Laurion*, 825 N.W.2d 725, 729 (Minn.2013) (summary judgment); *Bahr v. Capella Univ.*, 788 N.W.2d 76, 80 (Minn. 2010) (rule 12.02(e) dismissal).

Under the MUFTA, a transfer is actually fraudulent and therefore voidable "if the debtor made the transfer ... with actual intent to hinder, delay, or defraud any creditor of the debtor." Minn.Stat. § 513.44(a)(1). "Since the intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof, courts have relied on badges of fraud." *In re Butler*, 552 N.W.2d 226, 231 (Minn.1996) (quotation omitted). The badges of fraud are a nonexclusive list of factors that the court may consider when determining whether intent to commit actual fraud existed. Minn.Stat. § 513.44(b). For purposes of an actual-fraud claim, the "transfer or obligation is not voidable ... against a person who took in good faith and for a reasonably equivalent value." Minn.Stat. § 513.48(a).

A transfer is constructively fraudulent and voidable under the MUFTA if the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer" and "was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Minn.Stat. § 513.44(a)(2); *see also* Minn.Stat. § 513.45(a) (providing that a transfer is constructively fraudulent to present creditors if "the debtor made the

---

4. At oral argument, respondent banks argued that even if section 541.05, subdivision 1(6), were to apply to the receiver's MUFTA claims, there is still a question of fact as to whether the receiver's claims were timely.

transfer ... without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent at that time or ... became insolvent as a result of the transfer").

■ In ruling on both the motions to dismiss on the merits and the summary-judgment motions, the district court applied the Ponzi-scheme presumption, a rule originating in federal caselaw addressing clawback claims arising out of Ponzi schemes under state fraudulent-transfer acts. Under the Ponzi-scheme presumption, "to the extent innocent investors have received payments in excess of the amounts of the principal that they originally invested, those payments are avoidable as fraudulent transfers." *Donell v. Kowell*, 533 F.3d 762, 766–67, 770 (9th Cir. 2008) (discussing a UFTA claim brought in federal court under a comparable California statute, identical, in relevant part, with the MUFTA). "The policy justification is ratable distribution of remaining assets among all the defrauded investors. The

'winners' in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky." *Id.* (quotation omitted).[5]

Both Alliance and respondent banks argue that the district court erred by applying the Ponzi-scheme presumption to the receiver's claims under the MUFTA. There is no Minnesota appellate authority applying the Ponzi-scheme presumption, and so the question we must answer is whether it was within the district court's authority to apply that presumption or whether by doing so the district court improperly extended Minnesota law. *See Glorvigen v. Cirrus Design Corp.*, 796 N.W.2d 541, 557 (Minn.App.2011) ("The task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court." (quotation omitted)), *aff'd*, 816 N.W.2d 572 (Minn.2012). We need not determine whether the Ponzi-

---

**5.** As noted by the district court, the Ponzi-scheme presumption has been adopted and applied by numerous federal courts in the context of clawback actions brought against parties who have benefited from a Ponzi scheme under states' UFTA statutes, as well as under the bankruptcy code's similar fraudulent-transfer provision. *See* 37 Am.Jur.2d *Fraudulent Conveyances and Transfers* § 39 (2013) ("When investors invest in a Ponzi scheme, any payments that they receive in excess of their principal investments constitute fraudulent conveyances."); Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 Am. Bankr.L.J. 157, 164–65 (1998) ("Almost all courts have held that a debtor does not receive reasonably equivalent value or fair consideration for any payments made to its investors which represent fictitious profits."); *see, e.g., Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir.2011) (noting that the "the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal");

*In re Hedged—Invs. Assocs., Inc.*, 84 F.3d 1286, 1287–88, 1290 (10th Cir.1996) (holding that investor's contract with Ponzi-scheme operator was not enforceable insofar as it gave investor the right to recover payments in excess of her investment); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir.1995) (concluding that investor in Ponzi scheme could not keep his profits because he "should not be permitted to benefit from a fraud at [the expense of the other investors] merely because he was not himself to blame for the fraud"); *Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*, 462 B.R. 474, 485 (Bankr. S.D.N.Y.2011) ("The general rule in Ponzi scheme cases is that net winners must disgorge their winnings.") (compiling cases); *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 636 (Bankr.S.D.N.Y.2007) ("[V]irtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers." (quotation omitted)).

scheme presumption can ever be applied to claims asserted under the MUFTA. But we conclude that the application of the presumption in this case—at least as to the claims against Alliance—is inconsistent with the MUFTA and therefore constitutes an improper extension of Minnesota law.

Respondent banks argue that the Ponzi-scheme presumption is generally impracticable. They point to the fact that there are numerous potential definitions of a Ponzi scheme and point out that under some of those definitions, First United would not be considered a Ponzi scheme. But respondent banks do not dispute the district court's determination that First United was engaged in a Ponzi scheme. *See also Cmty. First Bank*, 822 N.W.2d at 311 (noting that First United was engaged in a Ponzi scheme and that its fraudulent activity began in 2002). Moreover, there are a great number of cases in which courts have adopted and applied the Ponzi-scheme presumption. Accordingly, we reject respondent banks' assertion that the Ponzi-scheme presumption is impracticable.[6]

 Application of the Ponzi-scheme presumption to the claims in this case would have three effects. First, under that presumption, the "mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." *Donell*, 533 F.3d at 770 (quotation omitted). Second, the presumption would establish for the purposes of showing constructive fraud that "the scheme operator was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or that the operator "intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." *Id.* at 770–71 (quotations omitted). Third, all profits that an investor in a Ponzi scheme received, even if taken in good faith, would not be considered to have been received for reasonably equivalent value. *Id.* at 772, 777–78. Thus, the Ponzi-scheme presumption actually can be understood to create three separate presumptions: courts presume (1) fraudulent intent, (2) a lack of sufficient assets to pay debts, and (3) a lack of reasonably equivalent value.

### A. The district court did not err by presuming fraudulent intent.

 The first effect of the Ponzi-scheme presumption is that the mere existence of a Ponzi scheme is sufficient to establish a presumption of actual intent to defraud. *Donell*, 533 F.3d at 770. This is a rational inference that a court can draw from the nature of a Ponzi scheme. A Ponzi scheme is meant to defraud future creditors. *See Cmty. First Bank*, 822 N.W.2d at 309 n. 1 (noting that a Ponzi scheme is a "fraudulent plan where money taken from later participants is paid to earlier participants to create the false appearance that the scheme is generating returns"); *see also Conroy v. Shott*, 9 Ohio Misc. 117, 363 F.2d 90, 91–93 (6th Cir. 1966) (explaining why fraud is a logical inference in Ponzi scheme cases); *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 860 (D.Utah 1987) (same). The MUFTA allows courts to consider numerous factors when determining if an actual intent to defraud exists. *See* Minn.Stat. § 513.44(b) (providing that the court may consider 11 specific factors "among other factors"); *In re Sholdan*,

---

**6.** Because we conclude that the district court erred by applying the Ponzi-scheme presumption to the claims against Alliance, we do not address Alliance's assertion that the presumption should be rejected because it is bad policy.

217 F.3d 1006, 1010 (8th Cir.2000) (noting that under the MUFTA the court is "free to consider any . . . factors bearing upon the issue of fraudulent intent"). Therefore, the first effect of the Ponzi-scheme presumption is not an extension of the MUFTA, but rather it is a rational inference that a court can draw from the nature of a Ponzi scheme.

Alliance and respondent banks argue that the presumption of fraudulent intent cannot be reconciled with the plain language of the MUFTA because the MUFTA requires that the court examine each individual transfer by the debtor to determine if it was made with actual intent to defraud a creditor. Section 513.44(a)(1) provides that a transfer is fraudulent if "the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor." "The definite article 'the' is a word of limitation that indicates a reference to a specific object." *State v. Hohenwald*, 815 N.W.2d 823, 830 (Minn.2012). The Ponzi-scheme presumption, however, merely provides that when an entity is operating a Ponzi scheme, a court can reasonably infer from the circumstantial evidence that the transactions that the entity made in the operation of that Ponzi scheme were intended to defraud later creditors. Although the MUFTA requires a plaintiff to show that specific transfers were made with actual intent to defraud, it contains no language precluding the inference of fraudulent intent from the surrounding circumstances, including the fact that specific transfers were made as part of a fraudulent scheme.[7] "[T]he intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof," *Butler*, 552 N.W.2d at 231, and under section 513.44(b) the court is "free to consider any . . . factors bearing upon the issue of fraudulent intent." *Sholdan*, 217 F.3d at 1010. Therefore, the presumption of fraudulent intent does not contradict the plain language of the MUFTA.

■ Alliance and respondent banks also contend that the presumption is inconsistent with the general purpose of the MUFTA.

The purpose or intent of the Fraudulent Transfer Act is to: "prevent debtors from putting property which is available for the payment of their debts beyond the reach of their creditors. If the property transferred is not subject to the claims of creditors, the rules as to fraudulent conveyances do not apply."

*Butler*, 552 N.W.2d at 232 (quoting *Kummet v. Thielen*, 210 Minn. 302, 306, 298 N.W. 245, 247 (1941)). The MUFTA is a remedial statute and is meant to be construed broadly. *Lind*, 204 Minn. at 40, 282 N.W. at 667 (discussing the MUFCA); *see Donell*, 533 F.3d at 774 (discussing early codifications of laws governing fraudulent transfers and noting that English courts construed "all statutes made against fraud . . . liberally and beneficially . . . to suppress the fraud" (quoting *Twyne's Case*, (1601) 76 Eng. Rep. 809 (Star Ch.)

**7.** The Supreme Court, when considering bankruptcy cases involving fraudulent conveyances, has stated that courts should not examine solely the transfer at issue in determining fraudulent intent. *See Pepper v. Litton*, 308 U.S. 295, 296, 312, 60 S.Ct. 238, 240, 248, 84 L.Ed. 281 (1939) (considering a bankruptcy action and discussing a "scheme to defraud creditors reminiscent of some of the evils with which [fraudulent conveyance acts were] designed to cope," noting that the fraudulent transfer could not "be taken as an isolated step unconnected with the long antecedent events, all designed to defeat creditors"); *Buffum v. Peter Barceloux Co.*, 289 U.S. 227, 232, 53 S.Ct. 539, 541, 77 L.Ed. 1140 (1933) (discussing a fraudulent conveyance in context of bankruptcy action, noting that the conveyance was "[m]ore . . . than a mere preference," but rather was a "step in a general plan which must be viewed as a whole with all its composite implications").

815–16; 3 Co. Rep. 80a, 82 a-b)). Several federal appellate courts have reasoned that investors in Ponzi schemes are "not actually investors, but rather tort creditors with a fraud claim for restitution equal to the amount they gave." *Donell*, 533 F.3d at 774–75; *see Perkins*, 661 F.3d at 627 ("Courts have recognized that defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment."); *Scholes*, 56 F.3d at 755 ("But *defrauded* investors, as we have pointed out, are tort creditors."). Here, the investors on whose behalf the receiver is seeking to claw back funds that First United transferred to respondent banks had claims for fraud against First United the moment that they purchased a loan-participation interest in a fraudulent or oversold loan. *Perkins*, 661 F.3d at 627. Therefore, when First United made payments to respondent banks—payments that the receiver alleges came from an account with commingled funds from defrauded investors and that occurred when First United was already insolvent—it was putting property that was otherwise available for the payment of its debts beyond the reach of its creditors. Because the MUFTA is a remedial statute and therefore construed liberally, the presumption of fraudulent intent is not inconsistent with the policy underlying the MUFTA.

■ Respondent banks argue that the presumption is inconsistent with legislative intent because it cannot be reconciled with the common-law definition of the phrase "hinder, delay, or defraud a creditor" in section 513.44(a)(1). "[W]hen the legislature uses a phrase we assume the legislature is aware of the common law understanding of the phrase and that the legislature intended to use the phrase according to its commonly understood meaning." *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 372 (Minn. 2011) (quotation omitted). Respondent banks correctly note that the supreme court has long held that a "mere preference by a debtor of one creditor to another is not fraudulent or void at common law, though the preference may have the incidental effect of hindering the latter from the collection of his debt."[8] *Mackellar v. Pillsbury*, 48 Minn. 396, 398, 51 N.W. 222, 222 (1892). But this rule applied to *mere* preferences, that is, transfers made without fraudulent intent. *See Imperial Elevator Co. v. Bennett*, 127 Minn. 256, 259–60, 149 N.W. 372, 373–74 (1914) (noting that a preference was not voidable when "there was no actual intent to defraud" on the part of the transferor); *Mackellar*, 48 Minn. at 399–400, 51 N.W. at 223 (noting that preference could have been "avoid[ed] ... as fraudulent," but because there was no evidence of intent to "hinder, delay, or defraud" creditors the transfer was valid). When a debtor made a preferential transfer with the intent to actually defraud a creditor, it was voidable at common law regardless of whether it was a preference. *Crookston State Bank v. Lee*, 124 Minn. 112, 113, 144 N.W. 433, 433–34 (1913) ("We do not mean to say that a transfer which works a preference may not at the same time be actually fraudulent as to creditors. It may be; and a preferential transfer may be avoided because of actual fraud inhering in it...."). The Ponzi-scheme presumption requires more than a mere preference. It requires that the transfer have been made in furtherance of a Ponzi scheme, which by its very nature is intended to defraud future investors. *Clearing House Co.*, 77

---

8. A preference is the "[p]riority of payment given to one or more creditors by a debtor." *Black's Law Dictionary* 1298 (9th ed.2009).

B.R. at 860; *Cmty. First Bank*, 822 N.W.2d at 309 n. 1. For this reason, the presumption of fraudulent intent is not contrary to legislative intent.[9]

### B. The district court did not err by presuming a lack of sufficient assets.

■ The second effect of the Ponzi-scheme presumption is the presumption that "the scheme operator was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or that the operator "intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." *Donell*, 533 F.3d at 770–71 (quotations omitted). Similar to the first element, this is a rational inference drawn from the nature of a Ponzi scheme, which must transfer money from later investors to earlier investors to pay its debts because the operator is insolvent. *Cmty. First Bank*, 822 N.W.2d at 309 n. 1. Therefore, the presumption of a lack of sufficient assets is not an extension of Minnesota law.

### C. At least with respect to the claims against Alliance, the district court erred by presuming that profits were not received for reasonably equivalent value.

■ The third effect of the Ponzi-scheme presumption is that all profits that an investor in a Ponzi scheme receives, even if taken in good faith, are presumed not to have been received for reasonably

equivalent value. *Donell*, 533 F.3d at 777–78. In *Donell*, the court justified the third effect on the ground that:

> Payouts of "profits" made by Ponzi scheme operators are not payments of return on investment from an actual business venture. Rather, they are payments that deplete the assets of the scheme operator for the purpose of creating the appearance of a profitable business venture. The appearance of a profitable business venture is used to convince early investors to "roll over" their investment instead of withdrawing it, and to convince new investors that the promised returns are guaranteed. Up to the amount that "profit" payments return the innocent investor's initial outlay, these payments are settlements against the defrauded investor's restitution claim. Up to this amount, therefore, there is an exchange of "reasonably equivalent value" for the defrauded investor's outlay. Amounts above this, however, are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business.

*Id.* at 777. The Seventh Circuit justified the third element of the Ponzi-scheme presumption on similar grounds. *Scholes*, 56 F.3d at 757 (noting that profits paid in the course of a Ponzi scheme cannot be for reasonably equivalent value because it is "not offset by anything, it is the residuum of income that remains when costs are netted against revenues. The paying out of profits to [an investor] not offset by further investments by him conferred no benefits on the corporations but merely

---

9. For similar reasons, we reject respondent banks' assertion that the Ponzi-scheme presumption is new law interpreting the MUFTA, and as such, its adoption is logically inconsistent with the conclusion that, under *McDaniel*, MUFTA claims are subject to the statute of limitations in section 541.05, subdivision 1(6), because the MUFTA codifies claims that existed at common law. Because preferences that were fraudulent transfers were actionable at common law, there is no logical inconsistency.

depleted their resources faster."). The above justifications are consistent with the UFTA drafters' explanation that " '[v]alue' is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors" and that "[c]onsideration having no utility from a creditor's viewpoint does not satisfy the statutory definition" of value. Unif. Fraudulent Transfer Act § 3, cmt. 2, 7A U.L.A. 48 (2006); *see Butler*, 552 N.W.2d at 231 ("The intention of the drafters of a uniform act becomes the legislative intent upon enactment."); *see also* 37 Am.Jur.2d *Fraudulent Conveyances and Transfers* § 28 (2013) ("In determining whether a debtor received reasonably equivalent value, the proper focus is on the net effect of the transfers on the debtor's estate and funds available to unsecured creditors.").

The above justification for the third effect of the Ponzi-scheme presumption does not apply to the receiver's claims against Alliance and may not apply to claims against respondent banks. The receiver does not assert that Alliance's participation was in an oversold or fraudulent loan. Moreover, it is undisputed that the Arizona borrower in whose loan Alliance purchased the participation paid First United the full amount of the loan principal, plus fees and interest, and that First United in turn paid Alliance the amount required under the loan-participation agreement. The payments to Alliance were not fictitious profits that depleted First United's resources, as in *Donell* and *Scholes*, but rather were profits that First United paid out in exchange for reasonably equivalent value. Therefore, unlike application of the first and second effects of the Ponzi-scheme presumption, applying the third effect to the claims against Alliance would be an extension of the presumption articulated in *Donell*. But more importantly, it would be an extension of the MUFTA.

The MUFTA provides that a transfer made with fraudulent intent is not voidable if the transferee "took in good faith and for a reasonably equivalent value." Minn. Stat. § 513.48(a). And a transfer is not constructively fraudulent under the MUFTA if it was made in exchange for reasonably equivalent value. Minn.Stat. §§ 513.44(a)(2), .45(a). Value is given if the transfer satisfies an antecedent debt.[10] Minn.Stat. § 513.43(a). Here, the record establishes that Alliance purchased a participation interest in a loan made by First United to a legitimate borrower and that the borrower repaid First United the loan principal, plus required interest and fees.[11] Moreover, the receiver did not allege in the district court, nor does it argue on appeal, that First United's payments to Alliance depleted First United's assets as envisioned by the court in *Donell* or the drafters of the UFTA, or that the underlying loan that Alliance participated in was in any way oversold or nonexistent. Further, the receiver does not assert that Alliance lacked good faith when it entered into the loan-participation agreement with First United.

10. An "antecedent debt" is a "debtor's ... obligation that existed before a debtor's transfer of an interest in property." *Black's Law Dictionary* 462 (9th ed.2009).

11. The receiver argues that Alliance was not actually a creditor to whom First United owed an antecedent debt because "[a]s a matter of law, participation agreements are not loans." But under the MUFTA, a "creditor" is "a person who has a claim," and a "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Minn.Stat. § 513.41, subds. 3–4 (emphasis added). Alliance had a contingent right of payment from First United, and therefore was a creditor owed an antecedent debt under the MUFTA.

Applying the presumption that profits were not received for reasonably equivalent value to the claims against Alliance would create an exception to the MUFTA's reasonably-equivalent-value defense against actual-fraud claims and the reasonably-equivalent-value element of constructive fraud. Minn.Stat. §§ 513.44(a)(1)–(2), .45, .48(a). If an exception to the MUFTA is to be adopted in Minnesota in Ponzi-scheme cases, it must be done by the supreme court or the legislature, not this court. This court is an intermediate appellate court, and its role is "primarily decisional and error correcting." *In re Trusteeship of Trust of Williams*, 631 N.W.2d 398, 410 (Minn.App. 2001) (quotation omitted), *review denied* (Minn. Sept. 25, 2001). As a general rule, "[t]his court, as an error correcting court, is without authority to change the law." *Lake George Park, L.L.C. v. IBM Mid-Am. Employees Fed. Credit Union*, 576 N.W.2d 463, 466 (Minn.App.1998), *review denied* (Minn. June 17, 1998). Adopting a presumption that profits were not received for reasonably equivalent value is not within this court's authority.

### D. Alliance is entitled to dismissal of the MUFTA claims against it, but the claims against respondent banks are sufficiently pleaded to survive dismissal for failure to state a claim.

Having addressed the permissible applications of the Ponzi-scheme presumption to this case, we turn to the parties' assertions that the district court erred in ruling on their dispositive motions.

Alliance challenges the district court's grant of summary judgment against it and the denial of its own motion for summary judgment. A district court properly grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. Because presuming that Alliance's profits were not received for reasonably equivalent value would improperly extend Minnesota law, the district court erred by relying on the Ponzi-scheme presumption to grant summary judgment to the receiver on these claims. Moreover, because the underlying uncontested facts show that First United received reasonably equivalent value for its transfers to Alliance, the district court erred by denying Alliance's motion for summary judgment.

Respondent banks challenge the district court's denial of their motions to dismiss the claims against them. Dismissal for failure to state a claim is proper only when "if it appears to a certainty that no facts, which could be introduced consistent with the pleading, exist which would support granting the relief demanded." *Bahr*, 788 N.W.2d at 80 (quotation omitted). The receiver alleges that when making transfers to respondent banks, First United was "insolvent when the transfers were made" and that because First United was engaged in a Ponzi scheme, First United "did not receive reasonably equivalent value in exchange for the profits it paid to [respondent banks and Alliance]." Construing the receiver's complaint liberally and accepting all facts alleged by the receiver as true and construing all reasonable inferences in favor of the receiver, the receiver's complaint sufficiently alleges that First United's transfers to respondent banks were made with fraudulent intent and that First United did not receive reasonably equivalent value in exchange for its transfers. *Cf. In re Tveten*, 402 N.W.2d 551, 556 (Minn.1987) (discussing the MUFCA and noting that the question

of whether a transfer was made with "fair consideration" involves a question of fact). It may be that, on a proper evidentiary showing, respondent banks will be entitled to summary judgment for the same reasons that we are directing dismissal of the receiver's claims against Alliance. As pleaded, however, the receiver's claims against respondent banks do not fail to state a claim upon which relief can be granted.

## DECISION

The district court did not err by dismissing as time-barred the receiver's constructive-fraud claims for transfers that occurred before May 11, 2005. We therefore affirm that dismissal. But the district court erred by dismissing as barred the receiver's actual-fraud claims for transfers before May 11, 2005, on the ground that they were barred by the statute of limitations in Minn.Stat. § 541.05, subd. 1(2). And the receiver's actual-fraud claims were sufficiently pleaded against respondent banks. We therefore reverse the district court's dismissal of the receiver's actual-fraud claims against respondent banks and remand for the district court's determination of whether respondent banks are entitled to dismissal under rule 12.02(e) because the claims are barred by the appropriate statute of limitations in Minn. Stat. § 541.05, subd. 1(6).

The district court erred by applying the Ponzi-scheme presumption to the transfers made by First United to Alliance and therefore erred by awarding summary judgment against Alliance. We therefore reverse its grant of summary judgment against Alliance and direct the district court to enter summary judgment for Alliance.

**Affirmed in part, reversed in part, and remanded.**